WILLIAM B. SWOPE AND VIRGINIA M. SWOPE, ET AL.,[1] PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3680-66—3682-66.   Filed December 19, 1968.

*LeRoy Katz*, for the petitioners.
*Robert A. Roberts*, for the respondent.

FORRESTER, *Judge:* In these consolidated cases, respondent has determined deficiences as follows:

| Docket No. | Petitioners | TYE— | Deficiency |
|---|---|---|---|
| 3682-66 | Jones & Swope, Inc | June 30, 1962 | $10,656.73 |
| 3681-66 | Paul W. Jones and Merla C. Jones | Dec. 31, 1961 | 5,326.50 |
| 3680-66 | William B. Swope and Virginia M. Swope | Dec. 31, 1961 [2] | 3,115.49 |

Several issues have been resolved by stipulation and concessions so that the only issue now remaining is whether the net income derived from rents, deeds of trust, notes, and contracts of sale on certain real properties, from September 1, 1961, to June 30, 1962, is includable in the gross income of Jones & Swope, Inc. The parties conceded all determinations made in docket Nos. 3680-66 and 3681-66, however, all petitioners are now contending that a part of the taxable income ascribed by respondent to Jones & Swope, Inc., is in fact the income of the husband petitioners, as joint venturers, in docket Nos. 3680-66 and 3681-66.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference and are adopted as part of our findings.

Jones & Swope, Inc. (hereinafter sometimes called J & S), petitioner in docket No. 3682-66, is a corporation with its principal and only

---

[1] Cases of the following petitioners are consolidated herewith: Paul W. Jones and Merla C. Jones, docket No. 3681-66, and Jones & Swope, Inc., docket No. 3682-66.

[2] Respondent also determined a relatively small deficiency for 1962 which has now been conceded by the petitioners in docket No. 3680-66.

office at Welch, W. Va. It was incorporated in West Virginia on July 1, 1961. It kept its books on the cash receipts and disbursements method and filed a Federal income tax return form purporting to cover a period beginning March 1, 1961, and ending June 30, 1962, with the district director of internal revenue, Parkersburg, W. Va.

Paul W. Jones (hereinafter sometimes referred to as Jones) and Merla C. Jones, petitioners in docket No. 3681–66, are husband and wife whose residence was Welch, W. Va., when their petition was filed. They filed a joint Federal income tax return for the calendar year 1961 with the district director of internal revenue, Parkersburg, W. Va.

William B. Swope (hereinafter sometimes referred to as Swope) and Virginia M. Swope, petitioners in docket No. 3680–66, are husband and wife whose residence was Welch, W. Va., when their petition was filed. They filed joint Federal income tax returns for the calendar years 1961 and 1962 with the district director of internal revenue, Parkersburg, W. Va.

William B. Swope is engaged in the real estate business. At one time or another he has also been in the construction and coal-mining businesses, and has participated with Jones in several ventures since about 1955. At the time of the trial herein, Swope was also Welch's mayor and city manager.

Pocahontas Fuel Co. (hereinafter sometimes referred to as Fuel Co.) is a Virginia corporation, which was merged into Consolidation Coal Co. (hereinafter sometimes referred to as Consol) in 1959. Subsequent to the merger it was treated as a division of Consol. Consol is a Pennsylvania corporation with home offices in Pittsburgh.

In September of 1960, Swope received a form letter from Fuel Co., signed by H. B. Crawford, stating that Fuel Co. desired to sell houses and related intangibles that it owned in Virginia and West Virginia. The letter was received subsequent to a personal call made upon Swope by H. B. Crawford.

Following the receipt of Crawford's letter, Swope and Jones entered into negotiations with the representatives of Consol and Fuel Co. for the possible purchase of the properties mentioned in Fuel Co.'s letter.

Sometime in May of 1961 Swope and Jones received a memo from the representatives of Fuel Co. and Consol, outlining several propositions, which stated, *inter alia:*

At a conference held in Pocahontas on the 18th of May, 1961, attended by Messrs. Luther, Crawford, Tutwiler and Gillespie, the following proposition was agreed upon to be submitted to Messrs. Swope and Jones:

1. The West Virginia property to be conveyed by one deed and the Virginia property to be conveyed by one deed, each deed to carry the restrictions, conditions and stipulations presently being used by Fuel Company and with covenants of special warranty of title.

    *         *         *         *         *         *         *

4. The notes presently existing on the houses heretofore sold and those which have been contracted to be sold to be endorsed to Swope and Jones without recourse and the contracts presently in existence for the sale of houses to be assigned to Swope and Jones. Fuel Company not to release or assign to Swope and Jones the lien of any deed of trust on houses heretofore sold, until the note secured thereby has been fully paid to the escrow agent or to Fuel Company.

\* \* \* \* \* \* \*

6. Fuel Company is to collect over the payroll from its employees who have executed valid wage assignments which have been delivered to Fuel Company within 60 days of the date of the bill of sale to Swope and Jones, the payments on contracts and deeds of trust presently in existence and payments on future purchases provided such wage assignments for payments on future purchases are simultaneously executed with said purchase. Fuel Company to deduct and retain Five Per Cent (5%) of all such collections.

\* \* \* \* \* \* \*

8. Swope and Jones are to immediately record the deeds from the Fuel Company and the deed of trust securing the indebtedness of Swope and Jones at their own expense.

\* \* \* \* \* \* \*

11. The assignments of the notes receivable and contracts to be effective as of March 1, 1961, and the rents on any houses not under contract of sale to be assigned to Swope and Jones as of June 1, 1961.

Consol was actively collecting accounts on 800 to 900 houses that were to be sold. Since the amount of money outstanding on the houses changed from day to day, March 1, 1961, was used as a cutoff date. Swope made his appraisals and offers on the basis of the March 1 balances.

On July 1, 1961, Jones, Swope, and Swope's wife organized a West Virginia corporation known as Jones & Swope, Inc., all of the stock of which was owned by the three organizers. The corporation was organized because in June of 1961 it looked as though the transactions with Fuel Co. would be consummated and neither Jones nor Swope wished to handle the transaction as individuals.

Following the formation of J & S, Swope continued to negotiate with the representatives of Fuel Co. and Consol. Late in August of 1961 a final price of $354,000, less credit for certain collections made by Consol between March 1, 1961, and September 1, 1961, was agreed upon for all of the houses together with the assignments of deeds of trust and contracts of sale. This figure represented a discount of approximately 50 percent on the face and appraised value of the total package.

On August 31, 1961, a special meeting of the board of directors of J & S was held at which time the board of directors authorized the president of J & S to enter into a contract with Consol for the purchase of the real and personal properties.

The board of directors further resolved that J & S would act as "manager, sales agent, and collection agent" for two corporations

which were to be formed by Swope and Jones for the purpose of acquiring the properties in Virginia and in West Virginia, respectively.

The minutes of the special meeting read (in pertinent part) as follows:

MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS OF JONES AND SWOPE, INCORPORATED

\*        \*        \*        \*        \*        \*        \*

The Chairman stated that the purpose of the meeting was to consider and act upon the proposition of purchasing or contracting to purchase certain real and personal properties from Consolidation Coal Company, a corporation.       ₀

Whereupon, W. B. Swope reported to the Directors that he had completed negotiations of a contract with Consolidation Coal Company to purchase real and personal property for the sum of $354,000.00 less payments collected by Consolidation Coal Company from the 1st day of March, 1961, until September 1, 1961.

After having heard the terms of the proposed contract read in detail and after a full discussion of the proposition it was unanimously:

RESOLVED: That it is the opinion of the Board of Directors of this company that the best interest of said company will be served by entering into the contract with Consolidation Coal Company for the purchase of said real and personal properties on the terms and at the price agreed; that the President be empowered and authorized to enter into said contract in the name of the company; that the President be authorized to make a note bearing interest at the rate of 6% per annum in the name of the company in the amount of the unpaid balance of the purchase price and deliver the same to Consolidation Coal Company.

RESOLVED FURTHER: That Jones & Swope, Inc., act as manager, sales agent, and collection agent for the two corporations to be formed by W. B. Swope and Paul W. Jones, one of which is to acquire and own the property located in the State of West Virginia, and the other to acquire and own the property located in the State of Virginia, for and in consideration of at least 20% of the gross collections from sales and rents.

\*        \*        \*        \*        \*        \*        \*

There being no further business before the meeting, it was adjourned sine die.

(S)   W. B. SWOPE,
        *Secretary*
(S)   PAUL W. JONES,
        *Chairman*

On September 1, 1961, Jones, acting as president of J & S executed a contract (hereinafter sometimes referred to as the contract) with Peter P. Ferretti, vice president of Consol, for the purchase of the real and personal properties in issue. The contract provided in pertinent part as follows:

THIS CONTRACT, made and entered into this the 1st day of September, 1961, by and between Jones and Swope, Incorporated, a corporation chartered, organized and existing under the laws of the State of West Virginia, hereinafter sometimes referred to as Jones and Swope, parties of the first part, and Consolidation Coal Company, a corporation, hereinafter sometimes referred to as Consol, party of the second part;

## WITNESSETH THAT

WHEREAS, Jones and Swope are desirous of purchasing from Consol, and Consol is desirous of selling to Jones and Swope, certain real estate with the improvements thereon, certain buildings located upon property of Consol which are to be removed therefrom by Jones and Swope, and certain contracts, notes, deeds of trust and choses in action, and

WHEREAS, it is recognized by the parties hereto that it will take some time to prepare the necessary deeds of conveyance transferring said real estate to said Jones and Swope, and

WHEREAS, Jones and Swope are desirous of taking possession of said real estate, buildings, and having transferred to them the said contracts, notes, deeds of trust and choses in action ;

NOW THEREFORE, for and in consideration of the sum of One and no/100 ($1.00) Dollar, cash in hand paid by each party hereto to the other party hereto, the receipt of which is hereby acknowledged, and in further consideration of the performance of the covenants, promises, stipulations and agreements hereinafter set out to be kept and performed by the parties hereto, it is mutually covenanted and agreed by and between the parties hereto as follows :

1. That Consol will, within a reasonable time from the date hereof, by good and sufficient deeds, with covenants of general warranty and subject to the reservations, conditions, restrictions, covenants and stipulations hereinafter set out or referred to, grant and convey substantially those certain lots, parcels or tracts of land, together with the improvements thereupon situate and appurtenances thereunto belonging, designated as follows :

    *        *        *        *        *        *        *

5. For the aforesaid real estate, buildings, notes, contracts, deeds of trust liens, and choses in action, Jones and Swope agree and bind themselves, their heirs and assigns, to pay to Consol, its successors or assigns, the sum of Three Hundred Fifty Four Thousand and no/100 ($354,000.00) Dollars, with interest from March 1, 1961 at Six Per Cent (6%) per annum, of which Eighty Eight Thousand Five Hundred and no/100 ($88,500.00) Dollars, with accrued interest on the said Three Hundred Fifty Four Thousand and no/100 ($354,000.00) Dollars, less Ninety Five Per Cent (95%) of the amount which shall have been paid on the notes and contracts of the purchasers of such of said properties as have heretofore been sold or contracted to be sold and which are set forth in the aforesaid schedules identified as "Pocahontas House Notes March 1, 1961 Deeds of Trust". and "Pocahontas House Notes March 1, 1961 Contracts", since March 1, 1961 to the date hereof is to be paid upon the execution of this agreement, and agree and bind themselves to make, execute and deliver to Consol a negotiable promissory note in the principal sum of Two Hundred Sixty Five Thousand Five Hundred and no/100 ($265,500.00) Dollars, bearing even date herewith, payable to the order of Consol, with interest at Six Per Cent (6%) per annum, and payable in three equal annual installments with accrued interest, said interest being payable annually. The note shall be secured by a deed of trust or deeds of trust at the election of Consol upon the real estate herein contemplated to be conveyed by Consol, * * *

On or about September 5, 1961, J & S received the following letter from Consol:

*September 5, 1961*

JONES & SWOPE, INC.
*Welch, West Virginia*
Re: House Sales
GENTLEMEN:

This Company is in receipt of the contract of September 1, 1961 between your company and Consolidation Coal Company pertaining to inter alia the sale of certain houses, the property of Consolidation Coal Company, and since it will be some time before the deeds of conveyance will be ready, this will be your authority to enter upon the premises and take possession of the subject property pending the return to you of an executed copy of the contract.

Yours very truly,

CONSOLIDATION COAL COMPANY
By: (S) PETER P. FERRETTI,
*Vice president*

Upon receipt of the letter of September 5, J & S took active possession of, and assumed the management of the properties. Collections were continued and certain properties were torn down in accordance with the contract.

According to the terms of the contract, J & S was to pay Consol one-quarter of the purchase price as of September 1, 1961, less a credit for certain collections made by Consol between March 1, 1961, and September 1, 1961. A 5-percent commission was charged by Consol for the collections.

Consol agreed to continue making collections from its employees after September 1, 1961. A 5-percent commission was also charged against these collections.

Consol's bookkeeping was usually about 1½ months behind, therefore J & S did not receive a statement regarding the one-quarter down payment and collection credit until the middle of October 1961.

On or about October 18, 1961, J & S received a statement of account from Consol for $33,277.68. That figure was arrived at as follows:

| | | |
|---|---|---|
| One-quarter of downpayment of $354,000 | $88,500.00 | |
| Interest of 6 percent on $354,000 from 3/1/61–9/1/61 | 10,620.00 | |
| Payment for life insurance premiums | 311.80 | |
| Total due Consol | | $99,431.80 |
| Less: Net Collections by Consol to 9/1/61, after 5-percent commission | | 66,154.12 |
| Net Due Consol as of 9/1/61 | | 33,277.68 |

On October 18, 1961, J & S drew a check on the corporate account at the McDowell County National Bank payable to Consol for the above balance.

On March 16, 1962, Itmann Realty Co. (hereinafter sometimes referred to as Itmann) was incorporated under the laws of West Virginia by William B. Swope, Virginia M. Swope, Paul W. Jones, and

Merla C. Jones, who also incorporated Pocahontas Realty Co. (hereinafter sometimes referred to as Pocahontas) under the laws of Virginia on March 23, 1962.

All of the stock of both Itmann and Pocahontas, except for 2 percent, was owned by the Swopes and the Joneses. The 2 percent was held by two secretaries employed by Swope, one of whom held her stock jointly with her husband.

It was Swope's understanding that the Virginia and West Virginia laws differed as regards ownership of realty by foreign corporations, and regarding the imposition of State sales and property taxes. Because of these differences, Swope believed that it was "almost necessary" to have the Virginia and West Virginia properties deeded to a Virginia and West Virginia corporation, respectively.

On or about April 10, 1962, the first meetings of the boards of directors of both Itmann and Pocahontas were held. The minutes of these meetings are identical, and both read in part:

On request, the Secretary reported that Jones & Swope, Inc., had entered into a contract with Consolidation Coal Company for the purchase of certain real and personal property for the use and benefit of this company, it then being understood and agreed that said contract in part would be assigned to this company by its proposed incorporators.

After having heard the terms of the contract, and of the proposed contract between Jones & Swope, Inc., and this company and after full discussion of the terms and conditions of said contracts it was unanimously

RESOLVED: That it is the opinion of the Board of Directors that the best interest of this company will be served by ratifying and confirming the contract made and entered into by and between Jones & Swope, Inc., and Consolidation Coal Company, a corporation, for the use and benefit of this company.

RESOLVED FURTHER: That this company accept the conveyances and transfers of said real and personal properties when conveyed by Consolidation. Furthermore that the President of this company be authorized to enter into a formal written agreement with Jones & Swope, Inc. Said agreement would employ Jones & Swope, Inc., as an exclusive sales and management agent of the properties purchased from Consolidation. It is understood that in consideration of services rendered and to be rendered said Jones & Swope, Inc., shall be paid a commission of 20% of the gross proceeds.

There being no further business, said meeting adjourned.

(S) PAUL W. JONES,
*President*

(S) W. B. SWOPE,
*Secretary*

On April 15, 1962, Itmann and Pocahontas each executed an identical "Memorandum of Agreement" with J & S. Such agreements read:

### MEMORANDUM OF AGREEMENT

THIS AGREEMENT, made and entered into this the 15th day of April, 1962, by and between ITMANN REALTY COMPANY [Pocahontas Realty Co.] party of the first part, sometimes hereinafter called Itmann, [Pocahontas] and JONES

AND SWOPE, INC., party of the second part, sometimes hereinafter called Jones & Swope, witnesseth:

WHEREAS, Jones & Swope, Inc., entered into a contract with Consolidation Coal Company for the purchase of certain real and personal property for the use and benefit of Itmann, [Pocahontas] pending its formation; and,

WHEREAS, by resolution duly adopted by the Board of Directors the contract was ratified and affirmed and the conveyances and transfers were accepted, and the proper officers of Itmann, [Pocahontas] were authorized and empowered to enter into a formal contract with Jones & Swope, Inc., employing it to sell, collect and otherwise manage said properties.

Now, THEREFORE, THIS AGREEMENT WITNESSETH: That Itmann, [Pocahontas] has employed Jones & Swope, Inc., to sell, collect, and manage the properties real and personal, to be conveyed and transferred to it by Consolidation Coal Company, and in consideration of such services Jones & Swope, Inc., shall receive a commission of 20% of the gross proceeds received whether from sales, rents or otherwise.

IN CONSIDERATION of the above Jones & Swope, Inc., covenants and agrees to exercise its best skill and judgment in selling, renting, leasing or otherwise disposing of the properties to keep proper and accurate records of all transactions; remit all amounts above its commission to Consolidation Coal Company to be applied to the payment of the purchase price, and to keep accurate books and records and make proper accounting to Itmann, [Pocahontas] all of transactions and the proceeds received therefrom.

WITNESS the following signatures as of the day, month and year first above written.

Attest:                           JONES AND SWOPE, INC.
(S)   W. B. SWOPE,          By  (S)   PAUL W. JONES,
         Secretary                        President

(S)   W. B. SWOPE,          ITMANN REALTY Co. [Pocahontas Realty Co.]
         Secretary          By  (S)   PAUL W. JONES,
                                          President

On April 15, 1962, special meetings of the boards of directors were held by J & S, Itmann, and Pocahontas. At each of these meetings the aforesaid agreements of April 15, 1962, were approved and it was resolved by the board of directors of J & S, "that the said Jones and Swope Incorporated proceed to manage said properties pursuant to said agreement[s]."

On April 25, 1962, Swope wrote to H. B. Crawford, land agent for Fuel Co., and requested that Consol deed the Virginia and West Virginia properties to Pocahontas and Itmann, respectively. This request was complied with on July 1, 1963, and September 28, 1963, respectively, by separate three-party instruments, each of which read in pertinent part:

That for and in consideration of the sum of * * * ($126,120.00) Dollars, cash in hand paid by Pocahontas to Consol, [($167,773.34) Dollars, cash in hand paid by Itmann to Consol] the receipts of which is hereby acknowledged, Consol does hereby grant and convey unto Pocahontas, [Itmann] * * * all of those

certain lots, parcels or tracts of land, together with the improvements thereupon situate and appurtenances thereunto belonging, lying and being in * * *

\* \* \* \* \* \* \*

Jones & Swope covenants with Consol that this conveyance to Pocahontas [Itmann] is made at the express request, direction and authorization of Jones & Swope and is made pursuant to the contractual obligation of Consol to convey said property to Jones & Swope as per contract of September 1, 1961, between Consol and Jones & Swope, * * * it is agreed that this conveyance is in full compliance with the terms, provisions, agreements, covenants and stipulations contained in said contract pertaining to the conveyance of the real estate therein referred to * * *

The J & S office was in Welch, W. Va., in a building known as the Swope Apartment on McDowell Street. The Swope Apartment was a three-story building. The first floor had six rooms which were used as offices. Swope had a personal office in this building, which was also used as an office for J & S, Itmann, Pocahontas, and other business interests of Swope and Jones. Space in three other rooms of the first floor was also used for J & S, Itmann, Pocahontas, and the other business interests of Swope and Jones.

It has been Swope's practice since 1939 to use the same office for collections and record-keeping of his clients and other business interests.

Both Itmann and Pocahontas had checking accounts, but those corporations had no employees other than their officers, and no checks were disbursed until November 1962. Prior to that time, all expenses attributed to either Itmann or Pocahontas by the petitioners were paid by J & S, which also collected the receipts from both the Virginia and West Virginia properties. J & S kept an account for Itmann and for Pocahontas, using all of the receipts from the properties in issue to pay on the balances of the amounts due Consol.

Bookkeeping, accounting, and office work for J & S, Itmann, and Pocahontas were performed by two of Swope's employees under Swope's direction. The tax returns for the above three corporations were prepared by either Swope or by his employees and his daughter, under his supervision. The salaries of Swope's employees, who performed office and bookkeeping services for J & S, Itmann, and Pocahontas, were divided between Swope's office and the corporations.

J & S was a fiscal year taxpayer and for the periods of time in question (assuming that it had commenced its business activities before it was actually chartered on July 1, 1961) it should have filed a Federal corporate income tax return for the period ending June 30, 1961, and for the fiscal year beginning July 1, 1961, and ending June 30, 1962. Swope, however, was uncertain of how to treat the transaction with Consol for tax purposes. Returns were therefore filed on behalf of J & S for the 16-month period beginning on March 1, 1961 (the cutoff date with Consol), and ending June 30, 1962.

Tax returns for Itmann and Pocahontas were also filed for this same 16-month period.

In preparing the above Federal income tax return for J & S, 20 percent of the gross collections from Consol was reflected as income, and expenses attributable to collections were deducted. The returns for Itmann and Pocahontas reflected the remaining 80 percent of the collections.

In his statutory notice of deficiency to J & S, respondent made adjustments to place Itmann, Pocahontas, and J & S all on a fiscal, 12-month year by eliminating the months of March, April, May, and June 1961, from the 16-month tax returns; eliminated the J & S commissions returned as received from Itmann and Pocahontas (disallowing both Itmann and Pocahontas deductions for said commissions) and allocated the adjusted net income of Itmann and Pocahontas to J & S.

### OPINION

On September 1, 1961, J & S executed a contract with Consol, as to which it alleges it was acting as agent, for the purchase and operation of certain real and personal properties.[3] Consol gave J & S a credit on the purchase price for certain collections made by Consol between March 1, 1961, and September 1, 1961, after deducting, *inter alia*, life insurance premiums, a 5-percent collection commission, and interest on the gross sales price from March 1, 1961, to September 1, 1961. J & S now recognizes that its return as filed should not have covered more than a 12-month period, but has consistently taken the position that the collections made by Consol, between March 1, 1961, and September 1, 1961, were income to the vendor, and that the basis of the vendee in the properties should accordingly be reduced from $354,000 to $287,845.88 by the net collections of $66,154.12 which were made by Consol between March 1 and September 1, 1961.

Respondent on brief argues that J & S has been the sole owner and operator of the properties since September 1, 1961, but concedes that none of the petitioners realized any income from them prior to September 1, 1961.

Respondent also, for the first time on reply brief, raises the point that the sum of $10,620 which was paid to Consol as "interest" from March 1 to September 1, 1961, under the contract was not truly interest, but was a further adjustment to the purchase price of the properties so that their basis in the hands of J & S was $298,465.88 instead of $287,845.88.

---

[3] Petitioners contend that under such agency, J & S was to manage the properties for a fee of 20 percent of gross collections, with the other 80 percent (less expenses) going to others. In its tax return, J & S showed only this 20 percent as its income.

Initially, we consider this belatedly raised point, and we find that the record is highly unsatisfactory.

The unstated implication of respondent's point is that some entity must now be deprived of an interest deduction of $10,620, but no such deduction was taken by any of the petitioners before us. Itmann and Pocahontas are not parties herein. Their returns covering the 16-month period claim interest deductions which (combined) seem large enough to include this $10,620 item, but it is pure surmise that they do. It is also these returns which make the only claims for depreciation which could relate to the subject properties. If they do so relate, we assume, and petitioners seem to contend, that such depreciation was computed on a combined basis of $287,845.88.

In his statutory deficiency notice to J & S, respondent, *inter alia*, allocated to that petitioner, income and expenses which had been reported by Itmann and Pocahontas without making any such adjustments as he now urges to the returned deductions of those corporations. The trial was had in this posture.

If our many assumptions are correct (and we remark that the deficiencies in the record are due to respondent's procedures rather than to any failure of proof on petitioners' part) then a part of the interest deduction in question, but a concomitant reduced depreciation deduction, was allocated to J & S by respondent's determination.

Under these circumstances it would be most unreasonable to allow respondent to raise this point for the first time on reply brief and we will not permit him to do so. This is not an instance of a determination being made in broad general terms and inherently supportable by several theories, one of which is urged for the first time on brief. It is rather a case where the respondent's position on brief is inconsistent with his determination, and more in the nature of an about-face. The situation here is almost identical to that dealt with in *Aubrey S. Nash*, 31 T.C. 569, 574, where we said:

On brief, and for the first time, respondent seeks to put in issue the question whether the debt herein became worthless in 1954. He made no such determination in his determination of deficiency, but to the contrary, allowed deduction of the indebtedness as a nonbusiness bad debt. The respondent's contention made on brief and for the first time accordingly has no standing in this case.

See also *W. H. Weaver*, 25 T.C. 1067, 1085–1086 (1956); and cf. *Arthur Sorin*, 29 T.C. 959, 969 (1958), affd. 271 F. 2d 741 (C.A. 2, 1959).

The remaining issue for our decision is whether all of the income (rather than only the 20-percent commissions) derived from the properties in issue from September 1, 1961, to June 30, 1962, is includable in the gross income of J & S.

In the explanation of adjustments accompanying the notice of deficiency to J & S, respondent determined "that the income and expenses reported by Itmann Realty Company and Pocahontas Realty Company for the fiscal year ended June 30, 1962, as adjusted, are your income and expenses." Respondent, on brief, relies solely on section 61(a) and takes the position that the income in issue is attributable only to J & S under the provisions of that section of the Internal Revenue Code of 1954, because Itmann Realty Co. and Pocahontas Realty Co. did not function in any income-producing capacity or activity.

Itmann and Pocahontas returned 80 percent of the income from the properties for the period September 1, 1961, to June 30, 1962. Those corporations were organized on March 16, 1962, and March 23, 1962, respectively, and petitions now concede that income is not to be attributed to them before formation, but argue that it follows logically that until March 1962, J & S was acting as an agent for Swope and Jones as individuals. Petitioners conclude that the 80 percent of income in question should be attributed to Swope and Jones as partners until March 1962 and thereafter, and until June 30, 1962, to Itmann and Pocahontas.

On consideration of the entire record, we have concluded that none of the income earned from the subject properties can be attributed to Swope and Jones as individuals during the period of time in question. In reaching this result we have examined the entire record carefully and have found that while Itmann and Pocahontas executed certain formal agreements with J & S, that no such agreements were ever even dealt for as between Swope and Jones and J & S. Neither of the individuals joined in any negotiations or transactions regarding the properties. No interest in the properties was attributed to either of them by any books or records, and neither included any of the income in question on his individual (joint) return. In fact, Swope testified that one of the reasons for forming J & S was that neither he nor Jones wanted to "handle the transaction as individuals."

We now examine petitioners' contention that 80 percent of the income from the properties is attributable to Itmann and Pocahontas after they were chartered in March 1962 and for the remainder of the fiscal year of each (June 30, 1962).

Petitioners admit that all activities in connection with the collections from, and management of the properties, were carried out by J & S. Swope, when asked to state just what Itmann and Pocahontas did in connection with the properties replied that they "didn't do anything."

It is petitioners' position that all management activities were conducted by J & S under the agreements between that corporation and Itmann and Pocahontas in return for 20 percent of the gross collec-

tions from the properties. This position necessarily places Itmann and Pocahontas in the roles of passive investors, paying for management.

The record does afford a minimum amount of formal support for petitioners' position that Itmann and Pocahontas sought management, but it fails entirely as to any showing of investment which could relate to the time and issue.

The J & S minutes of August 31, 1961, recite that J & S will act as managing agent of the properties for two corporations to be formed by Swope and Jones. The initial board meetings of both Itmann and Pocahontas held on April 10, 1962, recited that J & S had entered into the contract with Consol for their benefit, ratified such action, and authorized execution of a management and agency contract with J & S. On April 15, 1962, identical agreements were made between Itmann and J & S and Pocahontas and J & S reciting that the purchase of the properties from Consol by J & S had been for the use and benefit of Itmann and Pocahontas and reciting that each was employing J & S to manage the properties as agent in return for the 20-percent commission on gross proceeds. These agreements were ratified and approved at special directors meetings of Itmann, Pocahontas, and J & S, all of which were also held on April 15, 1962.

But none of this supports the position of Itmann and Pocahontas as investors. In the contract of September 1, 1961, between J & S and Consol no agency or possible third-party beneficiary is mentioned. Consol's settlement statement under said contract was addressed to J & S alone, the net amount of $33,277.68, shown as due to Consol, was paid by J & S on October 18, 1961, and there is no showing that any part of this amount was ever paid to J & S by either Itmann or Pocahontas.

Under the terms of the said September 1 contract J & S was obligated to execute and deliver to Consol a promissory note in the sum of $265,500 with interest at 6 percent and payable in three equal annual installments. In the absence of any evidence to the contrary we must assume that J & S made and delivered such note and the record is silent as to any reimbursements.

Also under the September 1 contract J & S was obligated to pay realty taxes, and to keep in force extended-coverage fire insurance and mortgagee life insurance. These expenses and the payments on the promissory note may have been made out of the income from the properties. In describing petitioners' recordkeeping Swope testified as follows:

Q. Did all of the transactions, Jones and Swope, Inc., on your books and records, reflect the moneys that came in from Consolidation and from the properties in Virginia and West Virginia?

A. We kept the records of who belonged to what.

Q. Did you pay Itmann Realty Company and Pocahontas Realty Company from these proceeds?

A. In the beginning we kept an accounting but we used their funds to pay the balance of the note that was due. Jones and Swope, Inc., in other words paid each month out of the moneys received on the note.

It didn't actually go to Itmann or Pocahontas but the books were kept to show it was for their account.

The books were not introduced into evidence, and even giving the above testimony its most favorable interpretation falls far short of establishing ownership of properties in Itmann and Pocahontas or even assumption of liability on the promissory note by those corporations. At best it shows that J & S was discharging its own obligations to pay operating expenses and to make principal payments out of receipts from the properties in question, and gratuitously assigning 80 percent of the results from such activities to Itmann and Pocahontas.

The contract of September 1, 1961, could have been assigned with Consol's written consent, but there is no evidence of any assignment and it consequently follows that the sole personal liability to Consol remained with J & S.

During the second fiscal year after the end of the fiscal year before us, and on July 1, 1963, and September 28, 1963, respectively, Pocahontas, J & S, and Consol, and Itmann, J & S, and Consol, entered into separate three-party instruments under which Itmann paid $167,773.34 to Consol and Pocahontas paid $126,120 to Consol, and the then remaining real properties in issue were conveyed by Consol to Pocahontas and to Itmann. The record does not reveal how the above sums were arrived at nor does it show that Itmann and Pocahontas were reimbursing or attempting to reimburse J & S for purchase-money payments and obligations by this transaction.

We conclude from the entire record that for the period of time in issue the properties were owned by J & S; that the income therefrom was produced by its activities and that these attempted assignments of that income are invalid. *Lucas* v. *Earl*, 281 U.S. 111 (1930); *Helvering* v. *Horst*, 311 U.S. 112 (1940).

*Decision will be entered under Rule 50.*