Max Dritz, et al. [1] v. Commissioner. Dritz v. Commissioner
Docket Nos. 3814-65, 3815-65, 3834-65, 5540-66.
United States Tax Court
T.C. Memo 1969-175; 1969 Tax Ct. Memo LEXIS 121; 28 T.C.M. (CCH) 874; T.C.M. (RIA) 69175; August 27, 1969, Filed Sidney A. Soltz, Biscayne Bldg., Miami, Fla., for the petitioners. Glen W. Gilson, II, for the respondent. 875 FORRESTER
Memorandum Findings *124 of Fact and Opinion FORRESTER, Judge: In these consolidated cases, respondent has determined deficiencies as follows: Dkt. No.
Petitioner
Year
Def.
Sec. 6651(a)
Sec. 6653(a)
3814-65
Max Dritz
1962
$ 1,670.01
$ 417.50
$ 83.50
1963
368.00
92.00
18.40
3815-65
Helen Dritz
1962
830.32
207.58
41.52
1963
38,291.47
9,572.87
1,914.57
3834-65
Max Dritz and Helen Dritz
1958
3,515.27
175.76
1959
4,392.68
658.90
219.63
1960
10,259.59
2,564.90
512.98
1961
5,614.03
280.70
5540-66
Helen Dritz, Transferee
1960
3,340.02
835.00
167.00
1961
3,633.20
544.98
181.66
1962
8,683.92
2,170.98
434.20
1963
1,801.09
450.27
90.05
Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by reference and are adopted as part of our findings. Petitioners Helen Dritz (hereinafter sometimes referred to as Helen) and Max Dritz (hereinafter sometimes referred to as Max) are and were husband and wife during the years involved herein. At the time of the filing of the petitions herein they resided at Miami Beach, Florida. *125 Max and Helen are calendar-year taxpayers who filed joint Federal income tax returns for 1958 through 1961, with the district director of internal revenue at New York, New York. Neither Max nor Helen filed any Federal income tax returns for 1962 or 1963. San Pat Realty Corporation (hereinafter sometimes referred to as San Pat) was incorporated during 1951 under the laws of New York and during all periods material hereto all of its outstanding stock was owned by Helen Dritz. San Pat filed Federal corporation income tax returns for 1960 and 1961 with the district director of internal revenue at New York, New York. San Pat did not file a Federal corporate income tax return for either 1962 or 1963. The sole asset of San Pat was an apartment building, including all items of furniture, furnishings and fixtures, oloated in Bronx, New York. The building had 65 apartments and six commercial stores. During the years involved herein Helen was the president of San Pat and Max was its secretary-treasurer. Several issues have been resolved by stipulation and concessions so that the remaining issues are whether: (1) Total deposits to a savings account in the name of Max Dritz, for each *126 of the years 1958 through 1963, represented additional income to him; (2) Helen had income from a rental property at Grand Avenue, Bronx, New York, during the years 1958 through 1963; (3) Helen and Max received constructive dividends through withdrawals from San Pat Realty Corporation during each of the years 1958 through 1961, and in addition whether they received taxable capital distributions through withdrawals from San Pat during each of the years 1958 and 1959; (4) Helen realized a long-term capital gain in the amount of $149,844.60 during 1963, from the complete liquidation of San Pat Realty Corporation; (5) Helen and Max are entitled to elect joint return computations under section 6013 [2] for the calendar years 1962 and 1963, by amended petitions, when neither Helen nor Max filed returns for these years; (6) Helen is liable as a transferee from San Pat Realty Corporation and, if so, to what extent; (7) Helen and Max are liable for additions to the tax under section 6651(a) (Failure to File Tax Return) for the years 1959, 1960, 1962, and 1963; *127 and 876 (8) Whether Helen and Max are liable for additions to the tax under section 6653(a) (Failure to Pay Tax) for the years 1958 through 1963. For convenience and clarity, we shall treat each of the above issues separately. Deposits in Savings Account This issue involves docket Nos. 3814-65 and 3834-65. At trial Max did not testify. All testimony for the petitioners, with the exception of one witness, was given by Helen. During the years 1958 through 1963 Max maintained a savings account at the Dollar Savings Bank of the City of New York (hereinafter sometimes referred to as Dollar Bank). He made deposits in this account during the years 1958 through 1963 totaling $5,228.07, $3,728.77, $15,334.16, $7,255.90, $8,044.57, and $2,699, respectively. For the six years, 1958 through 1963, the total monthly deposits were as follows: 1958
1959
1960
1961
1962
1963
Jan.
$ 100.00
$ 556.90
$ 606.00
$1,095.18
$ 100.00
Feb.
53.00
529.81
1,371.11
Mar.
1,688.78
298.95
1,869.07
458.00
851.45
Ap r.
2,582.50
399.45
2,203.45
268.76
107.00
2,320.00
May.
1,640.60
1,174.31
2,171.10
279.00
Jun.
500.00 322.00
480.59
164.40
Jul.
1,309.80
3,260.12
1,022.86
730.25
Aug.
413.67
1,244.79
280.00
739.13
Sep.
250.00
322.17
726.23
346.55
Oct.
803.79
705.00
1,115.85
304.40
Nov.
1,100.00
Dec.
2,137.15
1,123.30
164.00
Total
$5,228.07
$3,728.77
$15,334.16
$7,255.90
$8,044.57
$2,699.00
*128 In his statutory notice to Max (docket No. 3814-65) and in his statutory notice to Helen and Max (docket No. 3834-65), respondent determined that all of the deposits during the years 1958 through 1963 constituted additional taxable income. We have stated in numerous opinions that a presumption of correctness attaches to respondent's determination, see e. g., Estate of Robert Lyons Hague, 45 B.T.A. 104, 109 (1941), affd. 132 F. 2d 775, 776 (1943), certiorari denied 318 U.S. 787 (1943), and that the burden of overcoming this presumption, by admissible and credible evidence, is upon the taxpayer. See e. g., Nathan Bilsky, 31 T.C. 35, 45 (1958). Petitioners have failed to sustain their burden. Petitioners advance several explanations for the deposits made in Max's savings account at the Dollar Bank. We have considered each and every contention and find petitioners' explanations highly unsatisfactory. Respondent, in the instant case, has shown that petitioners either owned or had an interest in other rental properties in addition to their interest in San Pat. Respondent contends that these properties account for the unexplained *129 bank deposits. Petitioners, however, argue that the deposits arose from pension checks, social security checks, $100 received each month from Max's brother, rental payments of San Pat Realty Corporation, and "the children gave him their pay and that's how he accumulated the money." At trial Helen testified that the social security checks were always deposited and that the rental income from San Pat Realty Corporation was deposited in the savings bank when it was received late in the afternoon. She did not expand on claimed receipts from "the children." We do not know how many, their ages, their employment, or any other relevant facts. Petitioners either did not maintain adequate books and records or did not choose to produce such books and records in order to explain the character and content of any of the deposits. Moreover, the monthly breakdown of deposits, set out above, demonstrates, in addition to Helen's uncorroborated testimony, the lack of a definite or consistent pattern in the making of deposits. Furthermore, Helen's testimony regarding the deposit of Max's social 877 security deposits is further tarnished when it is compared with the monthly breakdown of deposits. *130 Over the six-year period no deposits were made in 25 of the months. We find and hold that petitioners have failed to meet their burden of proof and, accordingly, we find for the respondent on this issue. Rental Income from Grand Avenue, Bronx, N. Y. This issue involves docket Nos. 3815-65 and 3834-65. During the years 1958 through 1963 Helen owned a three-story apartment building at Grand Avenue, Bronx, N. Y., but no income from it was returned during the years in issue. Helen kept duplicate receipt books for this property, which books were given to her accountant each year for the preparation of her income tax return. Respondent, in his statutory notice of deficiency, determined that gross rents of $7,901 had been received from this property in each of the years 1958 through 1963, and he allowed such expenses as had been claimed in prior years to determine net rents of $5,656. The gross rents for each year were determined from rent control records of the City of New York. Petitioners assert that respondent's determination was arbitrary. Petitioners' contention is based on their claim that the receipt books were given to respondent's agent, but were given little or no *131 consideration and were never returned. Petitioners further assert that the lower-floor unit of the Grand Avenue property was occupied rent free by a caretaker and that for a part of the time involved herein petitioners occupied a top-floor apartment of the Grand Avenue property. As noted above, a presumption of correctness attaches to respondent's notice of deficiency and petitioners, to rebut this presumption, must sustain their burden of proof. We find Helen's testimony regarding the alleged loss of the receipt books highly implausible. No notice to produce was ever served; no testimony was offered by petitioners' accountant; nor were any records or workpapers produced. In fact, respondent had to resort to the rent-control records of the City of New York to determine this rental income, and produced the District Director of Rent Control for the Borough of the Bronx as a witness at the trial. Helen testified that a part of the building at Grand Avenue was occupied rent free by a caretaker and that petitioners occupied part of the top floor. While the evidence presented is far from satisfactory, we are persuaded that part of the building was so occupied. Accordingly, taking the *132 record as a whole, it is our best judgment that the net rents for each of the years 1958 through 1963 was $4,000, $4,000, $4,600, $5,200, $5,200, and $5,200, respectively. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). See Ralph E. Duncan, 30 T.C. 386 (1958). Dividends and Capital Distributions from San Pat Realty Corporation This issue involves docket No. 3834-65. Respondent determined that petitioners received constructive dividends through withdrawals from San Pat during each of the years 1958 through 1961 in the amounts of $1,168.86, $363.52, $11,434.37, and $9,381, respectively, and further that petitioners received capital distributions through withdrawals from San Pat during 1958 and 1959 in the amounts of $4,394.30 and $15,057.63, respectively. The parties have stipulated that during 1958 and 1959 San Pat had earnings and profits of $1,168.86 and $363.52, respectively, and that Helen's basis in the stock of San Pat on January 1, 1958, was at least $9,585.15. Respondent, in his statutory notice of deficiency, determined that for the calendar year 1958 total withdrawals of $15,148.31 were made from San Pat and that of this amount $1,168.86 *133 represented dividend income in accordance with San Pat's earnings and profits (section 316), that $9,585.15 represented a return of capital (section 301(c)(2)), and that the remainder of $4,394.30 represented capital gains (section 301(c)(3)(A)). For the calendar year 1959 respondent determined that withdrawals were made from San Pat in the amount of $15,421.15, and that of this amount $363.52 represented dividends in accordance with its earnings and profits (section 316), and that the remainder of $15,057.63 represented capital gains, since the adjusted basis of Helen's stock was reduced to zero in 1958 (section 301(c)(3)(A)). For the remaining years, 1960 and 1961, respondent determined that the respective amounts of alleged withdrawals constituted dividend income. Respondent reduced the amounts 878 of the alleged dividends for the years 1958 through 1961 by the dividend exclusion of $50. Petitioners argue that the record and evidence make it clear that respondent's determination is erroneous. Petitioners are in error. The record on this issue is representative of the entire record in this case. Petitioners, throughout, have largely failed in their attempt to produce credible *134 evidence. We have found petitioner's testimony vague, confusing and contradictory. Both on brief and at trial petitioners claimed that certain funds, viz: Max's pension, social security, and payments from his brother were deposited in the San Pat bank account, and that at least a part of the withdrawals from the San Pat bank account were of such funds rather than San Pat's funds. Yet these same funds were alleged to have been deposited in Max's savings account. Petitioners also claim that other funds, notably rents from the Grand Avenue property, money from their children, and insurance proceeds, were deposited in the San Pat account. Petitioners, however, other than by self-serving testimony, have not offered any documentary evidence substantiating these claims. Thus, petitioners have failed to meet their burden of proof on this issue and, accordingly, we find for the respondent. Gain on Liquidation of San Pat This issue involves docket No. 3815-65. On April 9, 1963, San Pat transferred and conveyed its apartment building and all of its furniture, furnishings and fixtures, to Helen without consideration; thereafter San Pat did not own any assets. Also on April 9, 1963, Helen *135 sold the apartment building and the furniture, furnishings and fixtures, to Lorsdale Realty Corporation (hereinafter sometimes referred to as Lorsdale) for a total purchase price of $246,000. At the time of sale the property was subject to a first mortgage in the amount of $52,910.29 and a second mortgage in the amount of $43,245.11. Lorsdale bought the property subject to both mortgages, together with other conditions. Respondent, in his notice of deficiency, determined that the transfer of all of San Pat's assets amounted to a complete liquidation and that Helen was therefore liable for tax at capital gain rates on the difference between the net amount received on liquidation and Helen's adjusted basis in her stock. See section 331(a)(1). There is no dispute between the parties that the net amount received from the sale of the assets is equivalent to the amount that she received upon complete liquidation. Accordingly, the amount of the capital gain will depend upon (1) Helen's adjusted basis in the stock of San Pat at the time of liquidation, and (2) the net amount received from the assets of San Pat (section 331(a)). The basis of Helen's stock in San Pat is related to the issue *136 previously considered by us, i.e., " Dividends and Capital Distributions from San Pat Realty Corporation." Petitioners make several arguments herein but fail, however, to recognize the nexus between the previous issue and this one. We found above that petitioners failed to prove that the basis of their stock was other than zero in 1958. We now hold that they have likewise failed to prove that the basis for Helen's stock was other than zero on April 9, 1963, the date of the liquidation. The second and final point under this issue is the net amount received by Helen on the sale of San Pat's assets. Respondent reduced the gross selling price by the sum of the first and second mortgages, totaling $96,155.40. Petitioners at trial introduced into evidence a purported closing statement of the sale on the basis of which they seek additional reductions from the gross selling price in the amount of $26,223. They also seek a $1,500 reduction from the gross selling price for attorneys' fees. The $26,223 of additional expenses claimed by petitioners consist of alleged payments for (1) a violation escrow, (2) franchise tax escrow, (3) payment on rewiring contract, (4) sums expended by Helen *137 as costs of sale, (5) title company fees, and (6) alleged payments for previously installed fixtures. We note that the document alleged to be a closing statement is at best most unusual. Two out of the three columns of figures contained therein do not add up correctly; page one states that the closing date is April 1, 1963, yet it is now stipulated that the sale date was April 9, 1963. Further, on page three a statement is made that a certain check was delivered April 4, 1963; and finally, the statement contains a "remark" and "conclusion" section which speaks, inter alia, of things to be done in the future. 879 We conclude that this instrument was not a "closing statement" within the usual meaning of that term. However, on consideration of Helen's testimony, and the entire record, we find and hold that, of the $26,223 [3] of additional expenses claimed on the closing statement, petitioners are entitled to reduce the gross selling price (in addition to the amounts for the first and second mortgages) of the assets by the following items and amounts: (1) Claimed building violation escrow of $3,000, nothing; (2) franchise taxes, $1,500; (3) rewiring, $8,863.50; (4) cost of sale, *138 $194.25; (5) title company fees, $418.25; and (6) claimed payment on "stoves, [and] frigidaires" of $12,257 or $12,254, nothing. The reduction of the gross selling price by items numbered (2), (3), (4), and (5) is supported by Helen's testimony. Moreover, we observe that these items are usual and customary in the closing of a sale of realty. We disallow item (1) because the record is deficient in the explanation of why, what and for whom this money, if paid, was paid. We assume that the violation escrow was paid for the purging of some misdemeanor; we know not, however, whether this amount was business related or personal. Accordingly, we hold that petitioners have failed to meet their burden of proof on this item. Helen's testimony as to item (6) is contradictory, and hence does not support it. At one point in the record Helen, in an effort to prove San Pat's rental income, testified: Q. Isn't it true that you could increase the rent whenever you made improvements? *139 A. No, sir, unless you put in combination Frigidaire and sink, which they allowed you $3 for each fixture. That's the only way you could increase. Since this amounted to a lot of money, so nobody would go through that to put it in. On the computation of the net sales price, however, Helen stated: Q. What were these conditional sales contracts? A. This was applied for fixtures that were put into the building. Q. Fixtures, what fixtures? A. Stoves, frigidaires. Q. That went into the building, is that right? A. That went into the building. Additionally, we also find that petitioners are entitled to reduce the gross selling price of the assets by $1,000 for attorneys' fees, instead of the $1,500 claimed. Our disallowance of $500 is predicated on the fact that petitioners' attorney, in addition to presiding at the closing, performed what we consider personal legal work for Helen - notably notably the removal of violations. Joint Return Computations This issue involves docket Nos. 3814-65 and 3815-65. Helen and Max did not file income tax returns for the calendar years 1962 and 1963 and have never filed such returns, but at the trial herein, and when the case was fully *140 at issue, they filed amendments to their petitions to this Court in which they allege error on the part of respondent based upon his failure to have issued a joint (rather than separate) statutory notices, and on his failure to give Helen and Max the benefits of joint rates and computations. Petitioners argue that no election was made by them until the amended petitions were filed, and that such pleadings should be treated as an election. Section 6012 requires a return to be made by individuals under 65 who have $600 or more of gross income for the taxable year and by individuals over 65 who have $1,200 or more of gross income for the taxable year. Congress, in 1948, in order to achieve equalization in the taxation of married couples, regardless of whether they were residents of a common-law or community property state, revised what is now section 6013 to provide that a "husband and wife may make a single return jointly * * *." See H. Rept. No. 1274, 80th Cong., 2d Sess. (1948), 1948-1 C.B. 241, 281, 285, 328. In addition section 6013(d)(3) of "Definitions" provides, "if a joint return is made, the tax shall be computed on the agregate income * * *." In the instant *141 case petitioners now seek the privileges of joint return computations although they have never made or filed the required returns. The foundation of our Federal system of income taxation rests upon the revelation of 880 details concerning his income by the taxpayer, self-assessment by him from such details, and the voluntary payment of taxes computed at the rates applicable to the return required of him, or elected by them in the case of a joint return. As such, section 6013 was intended to give spouses the privilege of making their returns jointly and thus the privilege of joint return rates. In light of the fact that our system is basically one of voluntary assessment and disclosure, we believe that the election of a joint computation by any other method than the "making of a return," as provided in section 6013 was never intended by Congress, and cannot be permitted. As regards petitioners' contention that the Commissioner should have "issued a joint notice," we observe that the Commissioner's only authority to send a joint notice is contained in section 6212(b)(2) and is there predicated upon "a joint income tax return filed by husband and wife, * * *." As regards petitioners' *142 contention that the Commissioner should have "computed * * * tax as on a joint return," we observe that such computations are authorized by section 2(a) which provides in pertinent part: SEC. 2. TAX IN CASE OF JOINT RETURN * * * (a) Rate of Tax. - In the case of a joint return of a husband and wife under section 6013, the tax imposed by section 1 shall be twice the tax which would be imposed if the taxable income were cut in half. * * * We conclude from the above that the Commissioner's determination was not only made correctly (but would probably have been objectionable if made under section 6212(b)(2), supra), and that these petitioners are not entitled to the benefits of joint rates. No different conclusions are possible under the clear language of these sections of the Code. Transferee Liability This issue involves docket No. 5540-66. As noted above San Pat was incorporated during 1951 under the laws of New York. During the years involved herein all of its stock was owned by Helen. San Pat filed corporation income tax returns for the calendar years 1960 and 1961; however, no corporate income tax returns were filed for either 1962 or 1963. On April 9, 1963, San Pat *143 transferred and conveyed, without consideration, all of its assets to Helen. Respondent on April 15, 1965, issued a statutory notice of deficiency to San Pat asserting therein that San Pat was liable for income taxes (and additions thereto under section 6651(a) and section 6653(a)) for the calendar years 1960 through 1963. San Pat did not file a petition with this Court for a redetermination of said deficiencies. For the calendar year 1960 San Pat consented, on Form 872, to the extension of the statute of limitations on assessment until June 30, 1965. On July 13, 1966, respondent determined that Helen was liable, as a transferee of the assets of San Pat, for the unpaid deficiencies in income taxes and additions thereto determined against San Pat on April 15, 1965. In her petition, Helen contends that no deficiencies or penalties are due from San Pat for the calendar years 1960 through 1963, and that the assessment and collection of the deficiencies and penalties for the calendar years 1960 and 1961 is barred by the statute of limitations. Initially, we address ourselves to Helen's second contention. On brief petitioners argue that the respondent has attempted to extend the *144 statute of limitations "by his ex parte action." We must assume that petitioners are referring to the suspensions of the running of limitations provided for by section 6503 since their brief on this issue displays an incomplete understanding of the applicable provisions of subtitle F. When respondent mailed his statutory notice of deficiency to San Pat on April 15, 1965, he was prohibited by section 6213 from making any assessment (other than a jeoprdy assessment) until the expiration of 90 days. At this point it is important to observe that section 6213 deals only with the restrictions on assessments and not with the period of limitations on assessments. Section 6503, however, prevents the period of limitations (see section 6501) from running during the period in which respondent is prohibited from making an assessment. See H. Rept. No. 2, 70th Cong., 1st Sess. 23, 24 (1928). With certain exceptions not here applicable, section 6503 provides for the suspension of the period of limitations for 60 days after the period during which respondent is 881 prohibited from making an assessment, which in the present case would be 90 days. Accordingly, section 6503, as applied to the *145 facts of the instant case, would suspend the period of limitations for a total of 150 days. By agreement between San Pat and respondent the statute of limitations for assessment of income tax for 1960 was extended until June 30, 1965. Thus, the 150 days during which the period of limitations on assessment was suspended by the operation of section 6503 would be added to June 30, 1965, to extend the period of limitations on assessment to November 27, 1965. Moreover, we note that the suspension of the period of limitations on assessment, as computed under section 6503, has been construed to run from the date upon which the statute of limitations on assessment would have run (in this case June 30, 1965), rather than the date upon which the deficiency notice was mailed (in this case April 15, 1965). See Aura Grimes Bales, and cases cited therein, 22 T.C. 355 (1954). Respondent, in his statutory notice, determined that Helen was liable as transferee of the assets of San Pat. Section 6901(c)(1) provides that the period of limitations for assessment of liability of an initial transferee shall be one year after the expiration of the period of limitations for assessment against *146 the transferor. Therefore, the period of limitations for assessment against Helen as a transferee for the calendar year 1960 would expire on November 27, 1966. Accordingly, the calendar year 1960 is not barred, since respondent's statutory notice of deficiency to Helen as a transferee, was mailed July 13, 1966. San Pat did not file its corporate income tax return for 1961 until May 24, 1962. Therefore, under the general rule of section 6501(a) the statute of limitations would not expire until May 24, 1965. As noted above, however, a statutory notice of deficiency was issued on April 15, 1965. Thus, under section 6503 the period of limitations on assessment would be suspended for 150 days so that it would expire on October 21, 1965. Accordingly, under section 6901 (c)(1), Helen's liability as an initial transferee would expire on October 21, 1966. Respondent's statutory notice of deficiency to Helen as a transferee was mailed July 13, 1966, accordingly, the calendar year 1961 is not barred. Because of the unavailability of records, respondent reconstructed San Pat's gross rental income from third-party records, primarily those of the Rent Control of the City of New York, made relatively *147 minor adjustments to claimed deductible expenses for 1960 and 1961, and based allowable 1962 and 1963 expenses on those allowed in 1960 and 1961. Petitioners, in seeking a redetermination of the resulting deficiencies, contend that respondent's agents failed to return certain records of theirs (the receipt books) and that the income from rentals as computed by respondent was overstated because of vacancies and uncollected rents. We have already discussed petitioners' contentions regarding these alleged missing records, and given our reasons for rejecting them. Petitioners again rely on Helen's testimony to substantiate vacancies and uncollected rents. As noted above, we found Helen's testimony less than satisfactory. At best it could be described as evasive and vague. We are, however, persuaded that in an operation of this size and character, some vacancies did exist and that some portion of the gross rent was uncollectible. Accordingly, on the basis of the whole record, it is our best judgment that the gross rentals of San Pat for each of the years 1960 through 1963 (February 28, 1963) were as follows: $52,900, $56,100,,$7,400, and $9,700, respectively. We so find and hold. *148 Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). On brief petitioners contend for the first time that San Pat should be allowed about $1,300 more operating expenses for 1963 than were allowed by respondent's determination. This issue was not framed specifically in the pleadings, see Rule 7(c)(4) (B)4, Tax Court Rules of Practice, nor was it considered at trial. Respondent argues that petitioner should not be allowed to raise this issue at this late date, and we agree. In the absence of an amended petition or proper motion to conform, we will not consider issues not raised by the pleadings. Earl V. Perry, 22 T.C. 968, 975 (1954); cf. Wm. B. Swope, 51 T.C. 442, 453 (1968). Moreover, this is so even when the evidence to be utilized has been already submitted for another purpose. D.N. & E. Walter & Co., Inc., et al., 10 B.T.A. 620, 632 (1928). As modified by our findings of San Pat's gross rentals for the years 1960 through 1963, we decide this issue for respondent, and any required adjustments to 882 respondent's determinations of dividends and capital distributions from San Pat will be made under Rule 50. Failure to File *149 Returns This issue concerns all dockets herein. In docket Nos. 3814-65 and 3815-65, respondent imposed additions to the tax under section 6651(a) against Max and Helen, respectively, for failure to file returns for the calendar years 1962 and 1963. In docket No. 3834-65 respondent imposed additions to the tax on Helen and Max for failure to file timely returns for the calendar years 1959 and 1960. In docket No. 5540-66 respondent imposed additions to the tax on Helen as transferee for San Pat's failure to file timely returns for the calendar years 1960 and 1961, and further for failure to file returns for the calendar years 1962 and 1963. Respondent's actions must be sustained unless petitioners establish that the failure to file and the late filing was due to reasonable cause and not due to willful neglect. Anne Goyne Mitchell, 51 T.C. 641, 647 (1969), on appeal (C.A. 5, June 16, 1969). Petitioners argue that the failure to file timely returns was attributable to the advice and workload of the certified public accountant engaged by them. Petitioners again have failed to carry their burden by not demonstrating that the failure to file timely returns was due *150 to reasonable cause. The cases are legion that the burden of filing returns cannot be avoided by placing the responsibility with an agent. See Malcolm Clifton Davenport, 6 T.C. 62, 67 (1946) and cases cited therein; see also Anne Goyne Mitchell, supra.Additionally, we note that if there were such extenuating circumstances as to characterize the petitioners' failure to file as reasonable, petitioners certainly could have called the certified public accountant as a witness. This they did not do. See Jane U. Elliott, 40 T.C. 304 (1963). Accordingly, we find for respondent on this issue. Negligence This issue concerns all years in all dockets herein. Respondent imposed additions to the tax, under section 6653(a), against Max and Helen for all of the years herein and further, in docket No. 5540-66, imposed additions under section 6653(a) against Helen as a transferee of the assets of San Pat. Section 6653(a) provides for the imposition of a 5-percent penalty when the deficiency, resulting from an underpayment, is due to either negligence or international disregard of rules and regulations. See Anne Goyne Mitchell, supra. The *151 burden of proving that no part of the underpayment was due to negligence is upon petitioners. They failed their burden. Petitioners argue that no negligence penalty should attach because of reliance upon the accountant and respondent's arbitrary determination. Petitioners' argument regarding the accountant is identical with their argument under section 6651(a). We reject this for the reasons therein stated and hold for respondent on this issue. Petitioners' second argument is that respondent was arbitrary. We note that petitioners have throughout their brief and at trial attempted to characterize almost all of respondent's determinations herein as arbitrary and thus avoid their burden of proof. Suffice it to say that we have seen no evidence of arbitrary behavior on respondent's part, and hold that there was none. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Helen Dritz, docket No. 3815-65; Max Dritz and Helen Dritz, docket No. 3834-65; and Helen Dritz, docket No. 5540-66.↩
2. All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. The amount of additional expenses as shown on the closing statement should be $26,233. The ten-dollar difference results from an error in the addition of the "costs of sale and satisfaction expenditures."↩