**Marko DUROVIC, Petitioner-Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.**

No. 72–1692.

United States Court of Appeals,
Seventh Circuit.

Argued April 16, 1973.

Decided Oct. 18, 1973.

Rehearing Denied Nov. 26, 1973.

Swygert, Chief Judge, filed an opin-
ion dissenting in part.

Anna R. Lavin, Edward J. Calihan, Jr., Chicago, Ill., for petitioner-appellant.

Scott P. Crampton, Asst. Atty. Gen., Jane M. Edmisten, Atty., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before SWYGERT, Chief Judge, and ·CASTLE and BARNES,* Circuit Judges.

BARNES, Circuit Judge.

This complex case comes to us as a timely petition to review a decision of the Tax Court of the United States. The Tax Court entered its decision on April 20, 1972, in accordance with its lengthy opinion, filed June 24, 1970, appearing in 54 U.S. Tax Court Rp. 1364 to 1402 (hereinafter "opinion").

The findings of fact of the Tax Court appear in said opinion at pages 1366 to 1383. Appellant's counsel states: "Those findings are correct and objectively set forth the evidence at trial. We would adopt them as a faithful statement of the evidence." (Opening Brief at 9).

This appeal, therefore, rests on the merits of appellant's claim that the Tax Court made erroneous conclusions upon the evidence before it.

Because of their length, we will not repeat the complete findings herein, but will assume a sufficiently interested reader of this opinion will have reviewed them himself. Some necessary facts, however, will be recited under the different issues presented.

## I. FACTS, GENERALLY.

For several years in Argentina prior to coming to the United States, appellant Marko Durovic (a lawyer), aided, financially and otherwise, his brother, Stevan Durovic (a physician), who had been experimenting, and conducting research into the cause of cancer. It was the latter's theory "that if a proper stimulant for the reticuloendothelial system could be found, the defensive and reparative cells comprising this system

* The Honorable STANLEY N. BARNES of the Ninth Circuit, sitting by designation.

could be made to produce a substance which would control malignant growth." (Opinion at 1367). In his experiments in Argentina, Stevan had unexpectedly, separated a substance (named Kositerin) which showed activity against hypertension. Some of this substance was tested in 1949 at the School of Medicine at Northwestern University in Illinois. The results were uncertain. No Kositerin was sold in Argentina, but some 72,200 ampules of the substance was made and placed in storage there. The Minister of Public Health of Argentina later ordered these 72,200 ampules destroyed, as a result of spoilage, on February 17, 1956.

Meanwhile in 1947 Stevan, in Argentina, continuing his research in the area of cancer, came upon a new substance, called drug "X", later to be called Krebiozen. It was produced by a similar method to that used to extract Kositerin. It used the same horse and cattle blood, stimulated with a new substance, "actinomyces bovis" instead of "actinobacilus lignieris."

In 1949, both Marko's wife Olga (who spoke English) and Stevan traveled to the United States to interest and obtain financial backing for the commercial production of these drugs. The previous financial backers in the Argentine during 1947, 1948 and 1949 (Tanoira, et al), were holding 2 grams, 35 centigrams of Krebiozen as security for the moneys they had advanced. Marko borrowed M$N2 million pesos and paid some 3,005,000 pesos to Tanoira on January 26, 1950, so that Marko and Stevan could have all papers and products shipped to the United States and could continue their previous experiments (from 1951 on) in the United States, at the Duga Biological Institute. (On April 5, 1954, the name was changed to Duga Laboratories.) (Both are referred

to as "Duga, Illinois" in the Tax Court opinion.) Duga, Illinois operated as an equal partnership between Marko and Stevan for the production, testing and distribution of the drug Krebiozen.

It was the partnership returns of "Duga, Illinois" which were filed with the collector in 1954 and which the appellant now urges *gave notice to the government that Marko had no individual income,* and allegedly commenced the running of the statute of limitations against the collection of deficiencies on any individual income taxes owed by the parties.

Although there is considerable dispute as to "cost of product", and a different total product cost used in the partnership 1954 return ($1,326,000) compared to the 1955–59 returns ($1,404,511.33); when divided by the number of capsules of drug "X" on hand (200,000 in 1951 and 136,097 in April, 1954), the 1954 computation asserted a cost of about $9.50 per ampule; the later computation about $10.32 per ampule.[1] We will consider other facts connected with product cost hereafter. We now turn to each issue.

## II. STATUTE OF LIMITATIONS.
WHETHER THE TIMELY AND COMPLETE FILING OF PARTNERSHIP RETURNS . . . COVERING THE TAX YEARS HEREIN QUESTION, AND DISCLOSING THERE WAS NO INDIVIDUAL INCOME COMMENCED THE RUNNING OF THE STATUTE OF LIMITATIONS FOR ASSESSMENTS AND COLLECTIONS OF ALLEGED DEFICIENCIES IN INDIVIDUAL INCOME TAXES AND ADDITIONS THERETO.[2]

We must decide what information is required on an individual taxpay-

---

1. The increase in total product cost was the addition of $78,511.33, claimed to have been incurred between May, 1951 and April, 1954, as reflected in the daily partnership records kept by Olga. The 1954 partnership return was never amended. It is undisputed that neither appellant nor his wife Olga filed any *individual* income tax returns for the years 1954 to 1958, inclusive, prior to March 10, 1965.

2. Each side presents the issues in differing language. We discuss all issues raised.

er's return, as distinguished from that required and returned on this partnership return.

The partnership return showed:

| | Received for Krebiozen | Cost of Goods Sold |
|---|---|---|
| 1954 | 149,694.10 | 172,957.74 |
| 1955 | 205,936.73 | 319,682.64 |
| 1956 | 171,926.98 | 244,738.80 |
| 1957 | 263,336.53 | 344,244.24 |
| 1958 | 217,213.36 | 251,611.92 |

Title 26 U.S.C. § 6012(a)(I)(A) requires that an income tax return be filed by "every individual having for the taxable year a gross income of $600 or more." Taxpayer had, in each year mentioned above, a gross income of $600 or more. 26 U.S.C. § 61(a)(13), and 26 U.S.C. § 702(c). In addition, the taxpayer and his wife had interest on a joint savings account of $680.00 in 1957 and $891.28 in 1958, and no other income during the years 1954 through 1958. Taxpayers must file a return "according to the forms and regulations" prescribed by the Secretary, and must include therein the information required by such forms or regulations. (§ 6011 (a)).

Title 26 U.S.C. § 6031 requires that every partnership shall make an information return, stating its gross income and the deductions allowable, and such other information as the Secretary of the Treasury requires. But the partnership is not liable for any tax: the individual taxpayers, in their individual capacity, are; and all partners are required to report their distributive shares on their individual returns.

Appellant asserts that "by reason of the family tax exemptions and deductions, and the losses of the Duga partnership, no individual tax return was required to be filed by petitioner for any years 1954 to 1958". (Brief, at 10.) The fallacy of his argument is that appellant refers to *net* income, not the *gross* income of $600 or more specified in the statute, and required to be filed by every individual, whether or not a partner.

There is simply no way to equate the two terms and appellant cites no cases to support the theory that the partnership return, *standing alone*, is a sufficient return to toll the statute of limitations.

The *sine qua non* expressed in Commissioner of Internal Revenue v. Lane-Wells Co., 321 U.S. 219, 64 S.Ct. 511, 88 L.Ed. 684 (1944) is that: "The returns did not show the facts on which liability would be predicated." (P. 223, 64 S.Ct. p. 513).

*And see:* Automobile Club v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); F. E. McGillick Co. v. Commissioner, 30 T.C. 1130 (1958); Danz v. Commissioner, 18 T.C. 454 (1952).

Appellant next asserts that since the Tax Court determined there was no fraud with respect to the deficiency determined for any year (54 T.C. at 1399, cited as 54 T.C. at 3075, Opening Brief at 11), and that there were no substantial omissions from gross income, Section 6501(e) of the Internal Revenue Code started the statute of limitations to run each year. This argument overlooks the fact that there is an exception to the "substantial omission rule" in § 6501(e)'s opening paragraph:

"Except as otherwise provided in subsection (c) . . . ."

Subsection (c)(3) provides:

"NO RETURN.—In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, *at any time*." (Emphasis added.)

It is true that the partnership return filed by Duga Laboratories reported all of appellant's actual income for 1954–56 and all income with the exception of dividend earnings of $681.00 and $891.-28 for 1957 and 1958 respectively. Appellant asserts that under the rationale of Germantown Trust Co. v. Commissioner of Internal Revenue, 309 U.S. 304, 60 S.Ct. 566, 84 L.Ed. 770 (1940), this information was sufficient notice to the

Commissioner of his tax liability to begin the running of the statute of limitations. We cannot accept this argument which makes the running of the limitations period depend upon such happenstance. An individual income tax return, if filed, would have accomplished its statutory purpose of making the Commissioner's auditing task simpler by assuring him that petitioner claimed no other income, credits, or deductions other than the ones on the partnership return. The filing of an informational partnership return, upon which no assessment can be made within the meaning of 26 U.S.C. § 6501, could not begin the running of the statute of limitations. We adhere to the reasoning of the Supreme Court in Commissioner of Internal Revenue v. Lane-Wells, 321 U.S. 219, 223–224, 64 S.Ct. 511, 513, 88 L.Ed. 684 (1944), which refused to find that the filing of one return began the running of the period of limitations on a tax due under a second return that was not filed, even though the first return contained a "full disclosure of . . . gross income and deductions and . . . resulting net income" Lane-Wells Co. v. Commissioner of Internal Revenue, 134 F.2d 977, 978 n. 4 (9th Cir. 1943):

> "Congress has given discretion to the Commissioner to prescribe by regulation forms of returns and has made it the duty of the taxpayer to comply. It thus implements the system of self-assessment which is so largely the basis of our American scheme of income taxation. The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished. For such purposes the regulation requiring two separate returns for these taxes was a reasonable and valid one and the

finding of the Board of Tax Appeals that the taxpayer is in default is correct."

We find the Tax Court properly held the statute of limitations did not bar the action against appellant.

## III. THE JEOPARDY ASSESSMENT.

APPELLANT ASSERTS THE PATENT ILLEGALITY OF THE JEOPARDY ASSESSMENT AND CALLS FOR THE COURT'S INTERCESSION. THE GOVERNMENT ASSERTS THE ASSESSMENT WAS LEGAL, AND APPELLANT IS ENTITLED TO NO RELIEF.

Section 6861(a) of the Internal Revenue Code Appendix, provides that the making of such assessment is within the discretion of the Secretary or his delegate. Section 6861(c) permits either of the said officers (they *may*) to abate such assessment if he *believes* it to be excessive, *"before* the decision of the Tax Court is rendered". Congress, in its wisdom, has thus seen fit to give the Secretary or his delegate a wide discretion, but only prior to litigation over the tax.

This Circuit has previously held that this discretionary power is not subject to judicial review. Veeder v. Commissioner of Internal Revenue, 36 F.2d 342 (7th Cir. 1929) and Kohler v. Commissioner of Internal Revenue, 37 B.T.A. 1019 (1938), dismissed by this Court on September 10, 1940. We have heretofore noted that "jeopardy assessments are of their nature and purpose arbitrary." Homan Mfg. Co. v. Long, 242 F.2d 645 (7th Cir. 1957).

Thus, while we might think the continuing jeopardy assessment, while perhaps originally reasonable, is presently unfair and unreasonable (and we do), we are without power to act.[3] The

---

3. As the Commissioner states in his brief (at 39):

"Taxpayer cites no precedent for the relief he requests, and our research reveals none. The statute itself provides two forms of relief. Section 6861(g) of the Code, Appendix, *infra,* provides that the Secretary or his delegate may abate the jeopardy assessment if he finds that jeopardy does not exist, provided that the abatement is made prior to a decision

jeopardy assessment remains validly in force.

## IV. IS THE PETITIONER ENTITLED TO FILE A JOINT RETURN WITH HIS WIFE, AND COMPUTE TAXES AT THE RATES APPLICABLE TO MARRIED PERSONS?

### IV A.—FACTS.

We now add to the recital of facts that subsequent to the assessed jeopardy deficiency against appellant on October 28, 1964· and the statutory notice of deficiency, identical in amount, issued within the 60 day period prescribed on December 28, 1964, the taxpayer and his wife, Olga, filed on March 10, 1965, joint income returns for the years 1954 through 1958, purportedly pursuant to § 6013(a) of the 1954 Internal Revenue Code.

Appellee relies on the express exceptions mentioned in § 6013(b) with respect to the rights given husband and wife taxpayers, under § 6013(a), to file joint returns.[4]

### IV B.—DISCUSSION.

■ The last taxable year here involved is 1958, and the last date prescribed by law for filing a 1958 return is April 15, 1959. The three years expired April 15, 1962. The appellants' joint return was filed March 10, 1965, almost three years too late for the last year with which we are concerned.

Appellant states that "§ 6013 has never been construed to bar an initial elec-

of the Tax Court or, if no petition is filed, prior to expiration of the period for filing such petition. Additionally, Section 6863(a) of the Code provides that collection of a jeopardy assessment shall be stayed if the taxpayer furnishes a bond. Under Section 6863 (b)(2) if 'the Tax Court determines that the amount assessed is greater than the amount which should have been assessed, then when the decision of the Tax Court is rendered the bond shall, at the request of the taxpayer, be proportionately reduced.' Taxpayer has not availed himself of these forms of relief. Under such circumstances, the jeopardy assessment remains validly in force."

tion to file a joint return made after the due date of a return". (Brief, at 21), citing one case—Spanos v. United States, 212 F.Supp. 861, fn. 3 (D.C. 1963); and Spanos v. United States, 323 F.2d 108 (4th Cir. 1963)—affirming in part, and reversing in part.

As the Tax Court stated, § 6013(b) was passed by the Congress "to remedy the dilemma which often befell married taxpayers who were required to make a binding election (as to the type of return they would file) at a time when they lacked 'informed tax knowledge not possessed by the average person'" "It was to permit married persons, who originally elect to file individual returns, to later change their election, and file joint returns at any time within the three year period of the statute of limitations." (54 U.S.T.C.Rep. .at 1401).

This same problem was faced by Mrs. Spanos after her husband had fraudulently failed to file a timely return for the year 1955, due April 15, 1956. On July 2, 1956, the husband and wife filed a joint return correctly setting forth their tax. Later that year, her husband died. The government sought a fraud penalty against her, even though she was innocent of any fraud, had no taxable income, and the tardy return was free from fraud.

Mrs. Spanos first took the position, as outlined in the Court of Appeals' *Spanos* opinion, "that a joint return belatedly filed is an ineffective election and imposed no legal obligation upon her. . . ."

4. Section 6013(b)(2) provides:
   "The election provided for in paragraph (1) may not be made—

   \* \* \*

   "(B) after the expiration of 3 years from the last date prescribed by law for filing the return for such taxable year . . . ; or
   "(C) after there has been mailed to either spouse, with respect to such taxable year, a notice of deficiency under section 6212, if the spouse, as to such notice, files a petition with the Tax Court . . . within the time prescribed in section 6213."

The Court of Appeals, though reversing any liability on her for her husband's fraudulent failure to file a return by April 15, 1956, disposed of her other contention as appears in the margin.[5]

The Tax Court here reasoned—"had (Mr. and Mrs. Durovic) originally filed individual returns for these years (1954–58), their election in 1965 to file joint returns would have been untimely. We see no reason why the same rule should not obtain where, as here, no returns were originally filed. However . . . 'as the result of a failure to file a return, the Commissioner has been required to make an election for the taxpayers . . . that election may not thereafter be altered.' Spanos v. United States, 212 F.Supp. 861, 864 (D. Md.1963)."

Appellant, in opposing this view, asserts that petitioner and his wife did not file individual returns originally, therefore, there is no statute of limitations to commence the running of the time within to make an election under any applicable provision of the Internal Revenue Code of 1954 (Appellant's brief, at 25). No cases are cited in *support of this theory of law. Spanos, supra,* does not support it. Section 6013 prohibits an election after the expiration of three years *from the last date prescribed by law* for filing the return for each taxable year (without regard to any extensions granted). By no stretch of imagination can this statute be interpreted to mean a complete failure to file erases the date from which the 3-year limitation starts to run. Congress could not have intended to put such power in the hands of a recalcitrant taxpayer, where, as the Tax Court noted, our system of "taxation is based on voluntary disclosure." (at 1402).

We agree with the Tax Court that the petitioner was not entitled to an election on March 10, 1965 that he would file a joint return with his wife.

## · V. THE COST OF GOODS.

## DID TAX COURT ERRONEOUSLY COMPUTE THE COSTS OF GOODS SOLD?

### V–A. FACTS.

Petitioner, on January 21, 1950, in Argentina, paid 1,268,193 Argentine pesos for the formula and rights to manufacture the drug Kositerin. On January 26, 1950, he purchased a half interest in the drug "X" or Krebiozen for 3,500,-000 Argentine pesos. Physically, he thus obtained the then entire supply of raw material Krebiozen (2 grams, 35 centigrams) later manufactured into 200,000 ampules. On February 7, 1950, petitioner came to the United States, manufactured the ampules of Krebiozen, and without cost, gave enough of them to certain doctors and institutions for experimentation and other evaluation of their value in the treatment of cancer.

In 1954, when a demand for the ampules became evident, they were sold for the first time. To make the partnership return in 1955 for 1954, it became necessary to convert the petitioner's investment into United States dollar equivalents. Petitioner used the figure of 3.36 pesos to the United States dollar. He arrived at the figure of 4,280,000 Argentine pesos as the total cost of both Kositerin and Krebiozen, or $1,273,809.-52.[6]

---

5. "For the reasons clearly set forth in its discussion of this contention, we conclude that the District Court correctly held that Mrs. Spanos, when she joined in the filing of the tardy joint return, became jointly and severally liable with her husband for the tax liability disclosed by the return, and for all interest and penalties arising out of that filing which might thereafter be assessed." (323 F.2d 108, 109).

6. Earlier, in early 1951, petitioner and his brother sought tax advice from an attorney, and on April 23, 1951, sought a tax-exempt status for the Krebiozen Research Foundation, and a ruling establishing the cost of the 200,000 ampules of Krebiozen at $1,326,000 (See Tax Court opinion, at 1377). This included United States $377,438.39 as the cost of Kositerin, United States $894,345.23 as the cost of Krebiozen. On May 9, 1951, the In-

The Tax Court found the cost of the Krebiozen ampules 3,005,000 Argentine pesos, and found that was the fair cost of the 200,000 ampules of Krebiozen produced in the United States. This would amount to $894,345 if we were to use petitioner's figure of 3.36 pesos per dollar.

## V–B.  DISCUSSION.

There were three principal differences however, between the figures claimed by petitioner, and those allowed by the Tax Court.

■ *First,* the *amount of research expenditures* in the United States.

The figure claimed by taxpayers as "research expense" admittedly included "extensive research relating to sterilizing, ampuling and packaging the drug,"[7] totaling $105,387.38.[8]

This figure was cut in half by the Tax Court, and one half allowed as "properly applicable to cost of goods sold.  Cohan v. Commissioner of Internal Revenue, 39 F.2d 540 (2nd Cir. 1930)."

This cryptic statement relies on what has long been a land-mark case in tax law—one written by one of our most illustrious and revered judges.  We assume the Tax Court relies on his language that "the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making."  (*Id.* at 544).

But in the *Cohan* case, Cohan kept no records whatsoever!  His figures were pure guesses.  Yet, Learned Hand thought he would not permit the Board to allow Cohan *Nothing* as deductible expenses.

Here the figures come from original records kept by Mrs. Durovic during a four and one-half year period.[9]  While, as we have stated above, we hold that the two amounts ($20,953.44 and $4,372.66) eliminated from the $130,713.48 amount claimed by taxpayer as expenses were properly deductible, we consider the halving of the $105,387.38 established by the records stipulated into evidence was arbitrary and capricious, and is not supported by Cohan v. Commissioner of Internal Revenue, *supra,* and that the expenses of research should have been allowed in the sum of $105,387.38, instead of $52,693.69.

This would result in an increased cost basis for the 200,000 ampules, in favor of the taxpayer.

*Second, the number of ampules sold.*

■ Petitioner insists that the 200,000 figure should not be used, as the number of ampules produced (and as the

---

ternal Revenue Service requested *additional information.*  On May 31, 1951, the request was *withdrawn,* because "most of their (our) records in reference to the cost are in Argentina," and "because of passport and permit status they (we) cannot go to Argentina now to obtain these records."  (See opinion, Note 9).  The petitioner and his brother therefore, made a tenative letter agreement with Krebiozen Research Foundation to sell the 200,000 ampules to the Foundation (or Institute) provided the Institute could obtain from the Internal Revenue Service a ruling or closing agreement under Section 3760 of the Internal Revenue Code that the ampules would be "capital assets" of the Durovics and "any profit that they might be held to have made on the sale will be treated as long term capitol gain."  Such a ruling was requested for the Institute, but was not granted.  The request was subsequently withdrawn.  No sale to the Institute was consummated.

7.  Petitioner had borrowed 2,000,000 Argentine pesos from one Ferrari in January, 1950, to buy out Tonoira.  After devaluation of the Argentine peso on August 29, 1950, a new agreement was made between petitioner and Ferrari that this loan be converted into United States dollars at 3.36 pesos per $1 or $600,000 United States dollars in round figures.

8.  54 U.S. Tax Court Rep. 1364, p. 1394.

9.  The original amount claimed as research cost was $130,713.48, substantiated by an expense journal maintained by Olga Durovic (54 U.S. Tax Court, 1381, Note 11).  The Tax Court reduced this amount by $20,953.44 attributable to petitioner's living costs from October, 1949 to April, 1954, and $4,372.66 expended in furtherance of the Institute (Krebiozen Research Foundation—a proposed tax-exempt foundation).  This left a net research cost of $105,387.38 (See 54 U.S. Tax Court, at 1394, notes 27 and 28).

Tax Court did), in determining ampule cost, but the figure of 136,097, the number of ampules remaining after Duga, Illinois had distributed 63,903 ampules to the medical profession, and to research, free of charge.

The Tax Court explained its holding, without the citation of cases, in the following language:

". . . Though we fully appreciate the altruistic as well as practical considerations which governed the choice of spreading cost over 136,-097 ampules as opposed to 200,000 ampules, we are constrained to hold that for the years 1954 through 1958, this method of apportionment did not clearly reflect income."

Thus, says petitioner, the Tax Court refused to credit petitioner the costs of manufacture of the 63,903 ampules distributed without charge.

As we understand the opinion, the United States expenditures of $52,693.-69 at which the Tax Court arrived by halving the $105,387.38 figure (net after deducting the Durovics' living expenses of $20,953.44, and the monies advanced to the "Institute" ($4,372.66, which deductions we have approved above), the balance of the $105,387.38 deduction sought was expended, because the partnership also incurred extensive research expenses, "as well as extensive expenses relating to sterilizing, ampuling, and packaging the drug." (Opinion, at 1394). Petitioners assert the amount expended in pure research in the United States was not more than $500.00.

We think it rather obvious that before Krebiozen could be sold in the United States, it would require certain approval and acceptance from the medical profession, from medical schools and from certain governmental agencies. It is undisputed factually that 63,903 ampules were so distributed without charge for such purposes.

We think that the attempt to gain acceptance of the drug Krebiozen by giving away samples to responsible physicians and medical schools was as much a business expense as the giving away of drug samples to physicians or tooth paste samples to dentists.[10]

Goods distributed free of charge should be treated as an expense for promoting good will,[11] or as an advertising expense, deductible as an ordinary and necessary business expenditure.[11a] Whatever way the expense of the goods distributed free of charge is to be deducted, they must have some cost for tax purposes. For this reason it is essential that the cost of producing the ampules should be spread over the 200,000 ampules actually produced. This case must be remanded, then, to permit the Tax Court to determine whether the taxpayer is to get a deduction for the cost of the 63,903 free ampules distributed as an advertising expense or as an amortizable good will expense.

Thirdly: *The proper conversion rate.*

Petitioner claims in his brief the applicable rate of exchange was "the basic buying rate," 3.36 M$N per United States dollar.[12] The Tax Court held the

---

10. As the Tax Court said in its opinion, with respect to another issue, "After all, 'Taxation is a practical matter' and should therefore, attempt to capture the realities of the situation in question." (Opinion, at 1390).

11. Compare Liberty Insurance Bank, 14 B.T.A. 1428, 1435 (1929), with Northwestern Yeast Co., 5 B.T.A. 232, 237 (1926).

11a. *Cf.* Richmond Hosiery Mills v. Commissioner of Internal Revenue, 29 F.2d 262 (5th Cir. 1928).

12. Nowhere in the Tax Court opinion does it use the term "basic buying rate". (Opinion,

Issue 2, at 1388–1390). Apparently this term came to petitioner's attention subsequent to the Tax Court hearing and decision (or at least subsequent to the hearing and briefing below.) Judge Irwin's opinion was filed June 24, 1970. On August 20, 1970, new counsel filed a "Motion to Reopen the Record for the Submission of Further Evidence." This was denied April 7, 1971.

This motion, apparently for the first time attacked the inadequacy of the Joint Exhibit 23–P; that it does not define "official rate" or "commercial rate"—nor does it take into consideration that each changed in 1950;

applicable rate of exchange was the "commercial rate" of 9.66 M$N to the United States dollar. The problem we face is that the petitioners presently claimed a "basic buying rate" should be used, and no basic buying rate appears in the record considered by the Tax Court.

Joint Exhibit 23–P indicates the "official rate of exchange" Argentine pesos to American dollars was constant for many years at 3.36 to $1 up to August 29, 1950 (at which time it advanced 5.00 to $1) and remained there through 1954. The Argentine transaction by which the Krebiozen powder was brought to the United States occurred, as was stated above, on January 26, 1950. On that the "commercial rate" of exchange was apparently 9.66 pesos to $1 dollar. (Joint Exhibit, per stipulation, 23–P). That, at least, was the Tax Court's interpretation of the evidence.

The determination of this issue is not aided by the varying language used to describe the same matters sought to be described. The opinion of the Tax Court refers only to "official rate of exchange", and "commercial rate of exchange". (See note 11.) Title 31, § 372(b) and (c) now relied on by petitioner in his brief, refers to "the buying rate in the New York market", and "the buying rate for cable transfers", but these were apparently not in evidence before the Tax Court. Even these definitions are obscured, as to Argentina alone, by four apparent separate "buying rates" for that country from January 16, 1950 to January 27, 1950:

| | | | | | | |
|---|---|---|---|---|---|---|
| Argentina-basic | 29.7778 | American | cents | for | pesos | |
| Argentina-Preferential "A" | 20.6949 | " | " | " | " | |
| Argentina-Preferential "B" | 17.4562 | " | " | " | " | |
| Argentina-Special | 13.8958 | " | " | " | " | |

Apparently these existed until August 29, 1950, when a rate designated

"preferential" replaced preferential "A", and preferential "B", and the "special rate" was discontinued. The "basic rate" remained the same (29.778 cents for the peso until August 28 (or August 29), 1950. The "preferential rate" came into being at that time at 13.333 cents per peso, and the "free rate" came into existence two months earlier in July, 1950, at 11.100 cents per peso. (See Appendix, Petitioner's Brief, Exs. A., B. & C. and Ex. 62.)

The documents in the Appendix attached to petitioner's brief apparently were not introduced into evidence before the Tax Court, for the petitioner asks this Court "to take judicial notice of those releases and bulletins reprinted herein." (Petitioner's brief, at 29).

Respondent challenges petitioner's use of the material attached to his brief; charging that petitioner seeks "to disavow the commercial rate schedule freely stipulated to by the parties (Joint Exhibit 23–P)" and used partially by the Tax Court in its opinion—(Table, Opinion at 1388).

The Tax Court opinion stated its "research had failed to uncover any cases that are on all fours with the question before us" (at 1389), citing Morris Marks Landau, 7 T.C. 12 (1946); Estate of A.H.G. Fokker, 10 T.C. 1225 (1948); and Credit & Investment Corp., 47 B.T.A. 673 (1942).

The Tax Court then said:

"In almost all these cases Commissioner asserted deficiencies based upon the official rate of exchange. See Ceska Cooper, 15 T.C. 757 (1950); Estate of Meinhuys [Nienhuys], 17 T.C. 1149 (1952); and Credit & Investment Corp., *supra*. However, in each instance the courts were unwilling to accept this argument when it was patently clear that the official rate of exchange did not reflect the

---

(though not until August 29, 1950 for the "official rate") ; nor does it "conform" to "the titles, figures and practices of the Reports of the Board of Governors of the Federal Reserve System of the United States." There

seems to be no "official rate of exchange" for Argentina, though there is such an "official rate of exchange" for most, if not all, other countries.

exchange rate at which foreign currency could be traded for United States dollars", citing Ceska Cooper, *supra* [15 T.C. 757], at 765.

"United States taxation is 'based on the value of property measured in United States dollars.'

". . . where gain or loss must be computed it is the actual cost of the investment in the terms of the number of dollars needed . . . which establishes basis, and the obtainable dollar equivalent of the currency received."

Thus the court concluded it should use the *"actual dollars worth in terms of salient market conditions"*, and held the commercial rate of exchange should be used. (Opinion, at 1390).[13] Can it be said here that "it is patently clear that the official rate of exchange did not reflect the exchange rate at which foreign currency *could be traded* for United States dollars" (emphasis added) in January, 1950?"

In coming to its pragmatic endeavor to adopt

"a rule of reason which reflects *actual* dollars worth in terms of salient market conditions", and "the realities of the situation", the Tax Court cites *Edmond Weil, Inc.*, a memorandum opinion dated August 9, 1944 (Opinion, Note 21 at 1390), in which the Tax Court used the commercial rate of exchange where the "evidence [established] that petitioner was never paid the 'official' rate in exchange transactions."

In considering the Tax Court's conclusions we note (a) that Joint Exhibit 23–P was stipulated into evidence as proof the "official rate of exchange" was 3.36 *up to* August 29, 1950; and the "commercial rate of exchange", 9.66

*throughout* 1950; (b) that the relevant dates are January 26, 1950, and February 7, 1950 (when the Krebiozen powder was bought and brought into the United States); (c) that there was no evidence before the Tax Court that there existed any restrictions making the use of the "official rate" impossible. (Ex. 62).

When the Argentine peso began to cheapen with respect to the American dollar, the banker who had lent petitioner roughly 2 million Argentine pesos in January, 1950, apparently became sufficiently worried by the slump in the peso's value to travel to Chicago to discuss the rate of exchange to be used by the parties. The loan was converted by mutual agreement of the parties into United States dollars at the rate of 3.36 pesos for one dollar. The rate used was the "official rate" described in Exhibit 62, which was based on the "buying rate" determined by the Board of Governors of the Federal Reserve System in New York for the two weeks ending January 30, 1950. While we do not agree with appellant that this *post facto* recognition of an exchange rate to be used by agreement of the parties to the transaction binds the government in the collection of income taxes, neither are we impressed with the position of the Tax Court that despite the fact it can find no cases on all fours with the facts of this case, it is "the inescapable conclusion" (Opinion, at 1389) from the cases it cites, *supra*, and Note 13, *supra*, the commercial rate of exchange "actually determines the number of dollars which reasonable businessmen, dealing at arms length will be willing to pay for a commodity at a given time." For, here, in the transaction under scrutiny, it did not. A figure different than the commercial rate, was utilized, agreeable to the understanding of the parties.

---

13. In addition to the five Tax Court cases and the one Board of Tax Appeals case hereinabove mentioned, the Tax Court cited as the basis of its conclusion the following:

Willard Hellburn, Inc., 20 T.C. 740 (1953); Edmond Weil, Inc. v. Commissioner of Internal Revenue, 150 F.2d 950 (2nd Cir. 1945); and James Q. Wheatley, 8 B.T.A. 1246, 1249 (1927) and in note 20, Elder v. Commissioner of Internal Revenue, 138 F.2d 27 (2nd Cir. 1943).

Further, in Eder v. Commissioner of Internal Revenue, 138 F.2d 27, at 28 (2nd Cir. 1943), Judge Frank wrote:

"We agree with the taxpayers that the Commissioner and the Tax Court were in error in adopting as the value of 'blocked' pesos the current rate of exchange for 'free' pesos."

Judge Frank goes on to say this does not mean the taxpayer must win, however, because it may have been possible for the taxpayer to show the value of "blocked" pesos in Columbia, and that he could have invested or spent them there; thus obtaining economic satisfaction. But there was no evidence in that record "to show how economic satisfaction in Columbia can be measured in American dollars". The Court therefore remanded the case to the Tax Court for further consideration of the appropriate measure of valuation.

Here the Argentine pesos were not "blocked", hence *Eder, supra,* is no authority for the position that the current rate of exchange for "free" pesos could not be used, nor is it authority for the position that the exchange rate for "free" pesos should be used.

The *Fokker* case *supra,* likewise deals with blocked Dutch guilders. We note, however, that Judge Arnold of the Tax Court wrote the following significant *dicta*:

"What rate of exchange shall be used in converting Dutch guilders into American dollars? There would be no problem if the valuation could be made at the date of decedent's death. At that time the official rate of exchange was $0.531 per guilder. (Emphasis added.) But the executor chose, as was his right, the date for evaluation as one year after death. The Tax Court followed *Landau, supra,* and valued the then blocked Dutch guilders at 5 cents per guilder."

Credit & Investment Corp. v. Commissioner, *supra,* likewise involved "blocked" German marks, and Estate of Jan Willem Nienhuys, *supra,* involved "blocked" Dutch guilders (valued at 10 cents per guilder). *Wheatley, supra,* involved a loss sustained in purchasing Argentine pesos, but if anything, favors taxpayer.

The Commissioner's Brief cites several of the same cases mentioned in the opinion involving "blocked" currency, and adds the following cases: Cooper v. Commissioner, 15 T.C. 757 (1950); The Foundation Company v. Commissioner, 14 T.C., 1333, 1355 (1950).

Here the Commissioner's Brief states it is "[T]he inevitable conclusion dictated by the foregoing cases . . . that the commercial exchange rate must be applied in the instant case." (Brief, at 29). Referring to the taxpayer's position dealing with appropriate conversion rates for assessing duties on imports, and that the "buying rate" for cable transfers is the proper conversion rate, the Commissioner states:

". . . both the statute cited (31 U.S.C. § 732(b) [§ 372(b) & (c)] and (c) and the case (Barr v. United States, 324 U.S. 83 [65 S.Ct. 522, 89 L.Ed. 765] (1945)) relate to custom duties and have no bearing upon proper conversion rates to be used in conjunction with questions arising under the Internal Revenue Code."

But the Commissioner cites no cases or statutes which support such a broad general statement. In The Foundation Company, Petr. v. Commissioner, 14 T.C. 1333, "blocked" Chilean pesos prevented the use of an official rate, and Judge Harron held:

"We have come to the conclusion that the loss is properly computed, in this proceeding and under its particular facts, by using the 'free' rate of exchange, and the 'free' rates on the dates petitioner received the respective payments in 1931, 1932 and 1933." (*Id.* at 1355).

This ruling was followed in *Ceska Cooper*, 15 T.C. 756, 765, relying on Landau v. Commissioner, 7 T.C. 12, "The official rate of exchange does not apply to blocked pounds." The Cooper case concludes: "The Commissioner has used in his determination of the defi-

ciencies the official rate of exchange of the pound. This, we hold, was error on his part, and the free rate of exchange should be used instead. *But see* The Foundation Company v. Commissioner, 14 T.C., 1333. As to this issue, the petitioner is sustained."

■ On this admittedly very unsatisfactory and unclear state of the law; (a) because of the efforts of petitioner to have us consider evidence not introduced below (by taking judicial notice of it); (b) because of the flat statements of the petitioner that Title 31, § 372(b) and (c) controls not only conversion of foreign currencies with respect to Custom's collection of duties, but also with respect to all tax matters, and the failure of either side to present controlling law or convincing analogy; (c) because Barr v. United States, 324 U.S. 83, 65 S.Ct. 522, 89 L.Ed. 765, although referring specifically to "the search which has been made for a measure of the true dollar value of *imported merchandise for customs purpose*"; and the right of Congress "to choose any standard of evaluation *for the assessment and collection of duties*", allegedly prevents any judicial review of the determination and certification by the Federal Reserve Bank of New York, of the *"buying rate"* to be used in all foreign currency conversion to which the Commissioner states this case "has no bearing" on our problem: (d) because petitioner seeks to be released by this court from his stipulation with respect to Joint Exhibit 23–P; (e) because Exhibit C in the Appendix, attached to Appellant's Brief, if properly introduced into evidence, indicates there was no such thing as an authorized "commercial rate" or "free rate", or "preferential rate", or anything other than a "basic" foreign exchange rate for Argentine pesos prior to the end of June, 1950; (f) because the Commissioner in support of the Tax Court relies almost exclusively on "blocked currency" cases; (g) because the Commissioner relies on "inevitable conclusions" that do not seem to be required by the cases submitted,

which largely rest on a different factual basis; and (h) because we believe the matter must be remanded to the Tax Court for recomputation in view of our findings as to number of ampules (Issue IV–A), we reverse the Tax Court on the issue of conversion values and remand for further exploration of the law and the fact, and a proper determination of that issue.

We are satisfied the Tax Court correctly ruled that taxpayer's investment in Kositerin was not part of the cost of Krebiozen sold; correctly excluded (1) taxpayer's living expenses from October, 1949 through June, 1952; and (2) office maintenance of the Krebiozen Foundation.

We have likewise concluded we can give no relief to the petitioners with respect to the jeopardy assessment.

Due to the unusual delays heretofore encountered in this matter, and the additional delays necessitated by the length of the record before us, we recommend that the Secretary of the Treasury, or his delegate, consider the advisability of raising the jeopardy assessment against petitioner with the use of amply sufficient bonding procedures.

Affirmed in part; reversed in part, and remanded in part for further consideration by the Tax Court in accordance with this opinion.

SWYGERT, Chief Judge (dissenting in part).

If we are to adhere to 26 U.S.C. § 6501 and the cases which have interpreted its predecessors, taxpayer must be held free from an assessment of tax for the fiscal years 1954 through 1958. The statute of limitations has run against the Commissioner. Accepting, *arguendo*, the opposite conclusion, I am at a loss to understand why it is that taxpayer—being newly apprised of an assessment of tax by the Commissioner—was not, like any other taxpayer filing a return for the first time, allowed to exercise the option of filing a joint return with his wife, rather than being taxed at an individual rate.

## I

The argument of the Commissioner on the question of the statute of limitations is essentially this:

> [U]se of partnership returns in conjunction with individual returns may help the Commissioner to ascertain a taxpayer's total gross income and, in that respect, may lessen the need for a period of limitations longer than three years in which to audit a taxpayer's return and compute his taxes. This fits into a larger rationale behind the period of limitations provisions, i. e., that the Commissioner should not be limited to a three-year period unless he is furnished with *all* of the data necessary to compute a taxpayer's income. Such needed data, in the case of a partner, include not only his distributive share of partnership gross income, but income from other sources, exemptions, deductions, and credits. App.Br. at 18, 19.

The majority reach their decision on exactly this basis, noting, too, that 26 U.S. C. § 6501(e)—which deals with substantial omissions from gross income reported on a return—is inapplicable by reason of a proviso appended thereto which makes an exception for cases where there has been a "failure to file a return." The majority add their estimation that the failure of Durovic to file Forms 1040 for the years in question contributed impermissibly to the Commissioner's task of auditing, and observe that a holding for Durovic on the authority of Germantown Trust Co. v. Commissioner of Internal Revenue, 309 U.S. 304, 60 S.Ct. 566, 84 L.Ed. 770 (1940), would foster situations in which the applicability of the limitations statute would depend on some undefined "happenstance." I submit that these various rationales do not stand penetrating analysis.

The overall statutory scheme of 26 U.S.C. § 6501 is more complex than a first reading suggests. Subsection 6501 (a) sets down the general rule of limitation on assessment and collection:

> Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

Six years, however, is allowed the Commissioner for an assessment when a taxpayer has made a "substantial omission of items" within the meaning of subsection 6501(e)(1)(A):

> If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—
>
> (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and
>
> (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.

By their very terms, neither provision applies when "no return" is filed.[1] In that event, by virtue of subsection 6501 (c)(3), the Commissioner may assess a tax whenever he chooses:

> *No return.*—In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

The central problem of this case lies in determining the meaning of the word "return" as used in the statute. Given subsection 6501(e), of one thing we may be sure: A return may on its face omit a substantial amount of gross income—well over twenty percent of the whole,

in fact—and still be a "return" within the meaning of section 6501.

In this light, it is curious that the Government makes an argument based on some "larger rationale" of section 6501, that "the Commissioner should not be limited to a three-year period [for assessment] unless, he is furnished with *all* of the data necessary to compute a taxpayer's income." Whether or not things "should" be this way is an issue beyond our province; the Government must address its argument to the wisdom of Congress, which has to date provided that the Commissioner has three years at most for an assessment when he is made aware of eighty percent, not all, of the gross income of a taxpayer.[2] It

---

1. Subsection 6501(e) opens with these words: "Except as otherwise provided in subsection (c)— . . . ."

2. The Government is confused in its interpretation of Germantown Trust Co. v. Commissioner of Internal Revenue, 309 U.S. 304, 60 S.Ct. 566, 84 L.Ed. 770 (1940) ; that case did not hold that a "return" must contain all of the data necessary to compute tax or income. Germantown Trust Company had filed in 1932 what was essentially an informational return as a fiduciary of the beneficiaries of a trust which it administered. I say "informational return" because the beneficiaries, not the Company, were liable for tax on trust income. Some three years later, the Commissioner determined that the Company was a corporation and taxable as such. The relevant statutory material in effect at the time was contained in sections 275 and 276 of the Internal Revenue Code of 1932. The former section provided in part:

Except as provided in section 276—

(a) *General rule.* The amount of income taxes imposed by this title shall be assessed within two years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

\* \* \*

(c) *Corporation and Shareholder.* If a corporation makes no return of the tax imposed by this title, but each of the shareholders includes in his return his distributive share of the net income of the corporation, then the tax of the corporation shall be assessed within four years after the last date on which any such shareholder's return was filed.

Section 276, subsection (a), provided :

*False return or no return.* In the case of a false or fraudulent return with intent

to evade tax or a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

The primary issue raised on appeal to the Supreme Court was whether subsection 275(a) or subsection 275(c) was controlling. The Court went along with the Company, holding precisely this :

It cannot be said that the petitioner, whether treated as a corporation or not, made no return of the tax imposed by the statute. Its return may have been incomplete in that it failed to compute a tax, but this defect falls short of rendering it no return whatever. 309 U.S. at 310, 60 S.Ct. at 569.

The Court, admittedly, was careful to note that the return was incomplete in no other way, citing the fact that the return "contained all of the data from which a tax could be computed and assessed." 309 U.S. at 308, 60 S.Ct. at 568. But by no exercise of caution could it have held the disclosure of something less would have rendered the fiduciary return "no return" within the meaning of subsection 275(c), for it was presented with a situation of full disclosure. Had, moreover, the Court ruled that an omission of gross income moved a filing from the realm of subsection 275(a) to that of subsection 275(c), its ruling would have had an applicability limited to events occurring before 1934, when section 275 was amended to include, for the first time, the predecessor to subsection 6501 (e)(1)(A). That provision, subsection 275 (c) of the Revenue Act of 1934, 48 Stat. 745 (May 10, 1934), reads as follows:

Omission from Gross Income. If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax

is of no significance, then, that the partnership returns filed by Durovic did not disclose his income from other sources.[3]

Of what other omissions, does the Commissioner complain? In short, his argument is addressed to missing "exemptions, deductions, and credits" to which Durovic may have been due. This contention, however, is naive at best and disingenuous at worst. With no intention of cynicism, I submit that the Commissioner cares not a whit for the deductions or other items which serve to reduce the amount of tax he ultimately receives from taxpayers. Nor should he. His function is to see to it that income is fully reported and that the deductions which are taken do not exceed the proper amount. In what is essentially an adversary scheme, it is left to the taxpayer to assert his entitlement to credits or deductions and to litigate the question of his right thereto when the Commissioner is in disagreement. In mute testimony to this arrangement are the legions of agents and auditors who are employed by the Internal Revenue Service to bring to light unreported income and overstated deductions—not to unearth deductions or credits which the taxpayer may have overlooked. This is not to say, of course, that the agents of the Commissioner will not reveal to a taxpayer a neglected deduction when they come across it. I have no doubt that this is done. My point is simply that the Commissioner is not engaged in that practice as an everyday matter, and that the taxpayer, not the Commissioner, suffers when a return fails to claim or omits information relating to a deduction. The views of the Government, I conclude, are of no help to the majority.

Except to the extent that the statute, soundly construed, reveals what may be omitted from a "return" without depriv-

ing it of that status for the purpose of section 6501, the definition of a "return" is not found in the statute. The key to the concept may be found, instead, in Commissioner of Internal Revenue v. Lane-Wells Co., 321 U.S. 219, 64 S.Ct. 511, 88 L.Ed. 684 (1944). The Company in that case had filed a corporate return for each of the fiscal years 1934 through 1936. It did not concurrently file a return as a holding company—a duty imposed on every corporate taxpayer who qualified for an additional tax as a holding company—and expressly denied being a taxable holding company by answering in the negative a question directed to that liability which was set out on the corporate tax forms it filed. In a ruling which reaffirmed the earlier case of Commissioner of Internal Revenue v. Germantown Trust Co., 309 U.S. 304, 60 S.Ct. 566, 84 L.Ed. 770 (1940), the Supreme Court held that the failure of the Company to file for each year a return relating to the tax on it as a holding company brought the case within subsection 276(a) of the Revenue Act of 1934, which allowed assessment "at any time." The acceptance by the Court of *Germantown*—which had held that a wrong return which disclosed all of the information upon which a tax could be computed failed to be "no return" within the meaning of subsection 275(c) of the 1932 Revenue Act—was dictated by the fact that the Court of Appeals for the Ninth Circuit had found that the returns filed by Lane-Wells "showed all the facts necessary for the respondent [Commissioner] to compute the taxes as a personal holding company obligation." Lane-Wells Co. v. Commissioner of Internal Revenue, 134 F.2d 977, 978 (9th Cir. 1943). The Supreme Court held, however, that more than this was needed to make the corporate returns at is-

may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.
As a final observation, I might add that *Germantown* held *sub silentio* that subsection 276(a)—the ancestor of subsection 6501(c)

(3)—was inapplicable to the facts of that case.

3. This extra-partnership income, the Government concedes, cannot comprise a sum even closely approaching twenty percent of Durovic's gross income for any of the years in question.

sue "returns" of the holding company tax:

> But it seems admitted that the returns did not show the facts on which liability would be predicated. Such liability was expressly denied by the return, and to obtain data on which corporations subject to the tax could be identified and assessed was the very purpose of requiring a separate return addressed to that liability. 321 U.S. at 223, 64 S.Ct. at 513.

Here, I submit, is the definition of a "return." To qualify as such with reference to a particular tax, a completed tax form must disclose "the facts on which liability [for that tax] would be predicated." How this phrase is to be interpreted in the setting of *Lane-Wells* is of crucial importance to this case, for if the Court meant that an affirmative response by the Company to the inquiry made on the corporate returns relative to its holding company status would have constituted a disclosure of the "facts" necessary to make the corporate forms "returns" of the holding company tax, I cannot conceive of the reasoning by which the majority affirms this case on the authority of *Lane-Wells*. Durovic filed partnership returns which disclosed well over $600 of gross income for each of the fiscal years in question. As the majority recognizes, the Commissioner could not have asked for a clearer signal that he was due individual income tax returns from Durovic.[4] This disclosure cannot be distinguished from the affirmative answer which the Company could have made in *Lane-Wells*.

The majority, however, read *Lane-Wells* to hold that two separate returns must be filed if two are required by the Commissioner, citing a paragraph of the *Lane-Wells* opinion which makes reference to the importance of "self-assessment" by taxpayers and the need of the Commissioner for the filing of tax information "with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished." Putting aside for the moment the question of the quotation, I submit that the basic position of the majority is in error. Why would the Court have made reference to the failure of the corporate returns to disclose "the facts on which liability would be predicated" if similar returns which had disclosed those facts would nonetheless have been inadequate? And if the rationale for their view is that the Commissioner is unduly burdened by having to make out a second return, I must point out that the Government has not made that complaint to this court, and, too, that the Court in *Germantown*—recognizing that the Commissioner "prepared from the Form 1041 return, a substitute corporation return on Form 1120," 309 U.S. at 306, 60 S.Ct. at 567—did not see fit to abstract from a silent record some need on the part of the Government. I would follow the example of *Germantown* and let the Government argue its burden if it must.

I turn, finally, to the quotation from *Lane-Wells* which the majority advance in support of their view. The passage which directly precedes the quotation reads:

> Taxpayer says that the information called for by [holding company] Form 1120H is information that could have been called for by Form 1120. We assume so, but we do not see how the fact helps the taxpayer, for the Treasury was fully within the statute in requiring that information in a separate return. 321 U.S. at 223, 64 S.Ct. at 513.

Given this, the concluding sentence of the quotation bears repeating:

> [T]he regulation requiring two separate returns for these taxes was a reasonable and valid one and the finding of the Board of Tax Appeals that

---

4. The partnership returns which was filed disclosed Durovic's name and address; the Commissioner thus had no difficulty in locating Durovic for the purpose of an assessment.

the taxpayer is in default is correct. 321 U.S. at 224, 64 S.Ct. at 513.

I cannot help but conclude, respectfully, that my colleagues take the quotation out of context. The language by the Court referring to "self-assessment" and the "physical task" of the Commissioner was in response to a challenge to the regulation requiring two separate returns, a particularly inappropriate contention given the rationale which the Court found to underlie the regulation: "[T]o obtain data on which corporations subject to the [holding company] tax could be identified and assessed was the very purpose of requiring a separate return addressed to that liability." 321 U.S. at 223, 64 S.Ct. at 513. The quotation proffered by the majority cannot, I think, be taken to modify the essential holding of *Lane-Wells*, namely, that a return of one tax constitutes the return of another if, as to the other tax, the facts upon which liability would be predicated are shown.

There can be little doubt that those facts were shown with respect to the individual income tax liability of Durovic by the partnership returns he filed. Whatever hesitance may exist on that score disappears when the reaffirmation of *Germantown* in *Lane-Wells* is considered. From what little appears in *Germantown*, a taxable entity was not in 1932 required to file both a fiduciary and a corporate return. One or the other sufficed.[5] It follows that the filing of one of two returns, alternatively required, qualifies under *Lane-Wells* as a disclosure of the facts upon which liability would be predicated on the unfiled return. In significant contrast, the returns which were filed in this case did not merely suggest that other returns might be due; they each disclosed a fact —gross individual income of over $600— which left no doubt that individual income tax returns were due. Taxpayer, I submit, filed returns of his individual income tax for the fiscal years at issue.[6]

## II

The majority ascribe three reasons to their reluctance to overturn the decision of the Commissioner to file individual returns rather than a joint return for Durovic and his wife. The first of these is contained in this passage:

The Tax Court here reasoned—"had (Mr. and Mrs. Durovic) originally filed individual returns for these years (1954–58), their election in 1965 to file joint returns would have been untimely. We see no reason why the same rule should not obtain where, as here, no returns were originally filed.

I disagree. All that need be cited in answer is a portion of 26 U.S.C. § 6013, the statute which authorizes and regulates the filing of joint returns by husband and wife:

(a) *Joint returns.*—A husband and wife may make a single return jointly of income taxes under subtitle A, even though one of the spouses has neither gross income nor deductions, except as provided below:

[inapplicable]

\* \* \*

(b) *Joint return after filing separate return.*—

(1) *In general.*—Except as provided in paragraph (2), if an individual has filed a separate re-

---

5. Were it otherwise, that is, were both required, *Germantown* and this case would be indistinguishable except for the irrelevant fact that the forms filed by Durovic were incomplete in minor respects.

6. I have not dealt directly with the majority's argument that my position would make "the running of the statute of limitations . . . depend upon . . . happenstance." Taking upon myself the liberty of clarifying this argument, I assume that the "happenstance" to which they refer is whether or not a taxpayer reports all of his gross income. Having done so, I understand the argument no better. While it is true that the applicability of the statute of limitations set out by subsection 6501(a) will be dependent upon a full disclosure of gross income, it is not true that no other statute will appy in the event of less than full disclosure. Either a three-year or six-year limitation would come into play, depending upon whether the taxpayer omits less or more, respectively, than twenty-five percent of the gross income disclosed on his return. 26 U.S.C. § 6501(e).

turn for a taxable year for which a joint return could have been made by him and his spouse under subsection (a) and the time prescribed by law for filing the return for such taxable year has expired, such individual and his spouse may nevertheless make a joint return for such taxable year.

\* \* \*

(2) *Limitations for making of elections.*—The election provided for in paragraph (1) may not be made—

\* \* \*

(B) after the expiration of 3 years from the last date prescribed by law for filing the return for such taxable year (determined without regard to any extension of time granted to either spouse); . . .

The fact that subsection 6013(b)(2) is specifically limited in application to cases falling within subsection 6013(b)(1), is, to my mind, a quite sufficient reason to distinguish cases where no returns are originally filed and those where an individual "has filed a separate return for a taxable year for which a joint return could have been made by him." 26 U.S.C. § 6013(b)(1). We are told, however, that Congress intended subsection 6013(b)(2) to have a broader reach than its literal reading would suggest:

Section 6013 prohibits an election after the expiration of three years *from the last date prescribed by law* for filing the return for each taxable year (without regard to any extensions granted). By no stretch of imagination can this statute be interpreted to mean a complete failure to file erases the date from which the 3-year limitation starts to run. Congress could not have intended to put such power in the hands of a recalcitrant taxpayer, where, as the Tax Court noted, our system of "taxation is based on voluntary disclosure." [7]

To what "power" in the recalcitrant taxpayer do my brothers refer? It is, I assume, the power to refuse or neglect to file a return. But I fail to see the reason for reading into section 6013 a purpose to foster voluntary disclosure by a taxpayer when numerous other provisions of the Internal Revenue Code are specifically aimed at his obstinance. See 26 U.S.C. §§ 6651, 7203; 26 C.F.R. § 301.6651–1. Can it be said that the foreclosure of an option to file jointly will appreciably spur a return of tax by a couple who are willing to take the risk of a penalty? I would hesitate so to assert. What lies implicit at the root of the second justification advanced by my colleagues is, I opine, a conviction that the disinclination of a taxpayer to make a voluntary disclosure of his liability may be gauged by his readiness to file a return. This view, however, compounds the error the majority make in dealing with section 6501. As I have demonstrated, a return may disclose only a portion of a taxpayer's gross income —as little, I suppose, as is needed to show liability—and still be a "return" for the purposes of certain tax laws. Thus, the taxpayer who files a return may be as recalcitrant or dishonest as the one who does not. Add to these observations the fact that the legislative history of section 6013 gives no hint of a Congressional purpose to encourage voluntary disclosure by section 6013, and the conclusion becomes inescapable that subsection 6013(b)(2) must be limited, as it states on its face, to situations where a return which elects individual filing status has been made.

Spanos v. United States, 212 F.Supp. 861 (D.Md.1963), constitutes the final authority in support of the majority decision. The plaintiff in that case, seeking to avoid a fraud penalty based on a return jointly filed by her and her husband, argued that a taxpayer could not legally make a determination to file a

---

7. For a similar argument see Dritz v. Commissioner, 28 T.C.M. 874, 879–80 (1969), which erroneously suggests that section 6013 gave spouses a "privilege" of making their returns jointly.

joint return after its due date. The district court did not agree:

> As the Commissioner points out, in the absence of the special factors present in the authorities cited by the taxpayer, administratively the Act has not been construed to bar an initial election made after the due date of a return. 212 F.Supp. at 864 n. 3.

The authorities cited by the taxpayer to which the court made reference were employed to support the following dicta, that upon which the majority rests its holding:

> [T]he cases introduce into § 6013 the principle, founded upon equitable considerations, that if an election has been made and acted upon by the Commissioner, or if, as the result of a failure to file a return, the Commissioner has been required to make an election for the taxpayers (or change an election due to a spouse's valid nonacquiescence), that election may not thereafter be altered. 212 F.Supp. at 863–864.

The most significant point of this statement is that "equitable considerations"— not some statutory construction—are the underpinning of the rule it espouses. The cases upon which the rule rests then, are highly pertinent to determining the kind and nature of equities which arise when an election of filing status is made by the Commissioner.

The cases are three in number: Grant v. Rose, 24 F.2d 115 (N.D.Ga.1928), aff'd Rose v. Grant, 39 F.2d 340 (5th Cir. 1930); Grobart v. Commissioner, 20 T.C.M. 629 (1961); and Mundy v. Commissioner, 14 T.C.M. 1067 (1955). Of these, only *Grobart* and *Mundy* are particularly apposite to this case: *Rose* was a case where taxpayers had made a return and an election of joint filing status. *Mundy*, moreover, is more remarkable for its absence of principle than

its revelation of equities. As here, the taxpayer had failed to file income tax returns for several fiscal years; the Commissioner determined deficiencies for those years and sought to collect tax computed at an individual rate though the taxpayer was married. When the taxpayer complained, the Tax Court upheld the Commissioner by this reasoning:

> Under section 51(b)(1), Internal Revenue Code of 1939, a husband and wife may elect to make a "single return jointly." That election must be exercised by the taxpayers at the time the return is filed. Therefore, as Joseph A. Mundy filed no income tax returns for these years the split income provisions were never elected by him. 14 T.C.M. at 1072.

Whatever the validity of this statutory interpretation under the Internal Revenue Code of 1939,[8] Congress has since deprived it of force by passing subsection 6013(b). It is no longer true that an election to file jointly "must be exercised by . . . taxpayers at the time the return is filed," and I turn to *Grobart* in search of the equitable considerations to which *Spanos* made reference.

The taxpayer in *Grobart* received in February of 1957 a notice of deficiency from the Commissioner, which computed tax for a number of preceding fiscal years on the basis of individual tax rates. Over two years later, after the taxpayer had gone so far as to have his case docketed in the Tax Court, he and his wife filed joint returns for the years in question. The Tax Court held that the couple was bound by the computation of the Commissioner, citing language from Grant v. Rose, 24 F.2d 115, 118 (N.D.Ga.1928):

> "There is nothing in the law to prohibit the choice of joint or separate

---

8. Section 51 of the Internal Revenue Code of 1939, 53 Stat. 27 (Feb. 10, 1939), contained this truncated version of the present section 6013:

    In the case of a husband and wife living together the income of each (even though one has no gross income) may be included in a single return made by them jointly, in which case the tax shall be computed on the aggregate income, and the liability with respect to the tax shall be joint and several. No joint return may be made if either the husband or wife is a nonresident alien.

returns according to the result on the taxes to be paid, although husband and wife actually have kept their affairs entirely separate. On the other hand, *there is nothing in the act to extend the right of choice beyond the time for making the returns.* It is not unreasonable to claim a right to substitute one form of return for the other up to the last day for making returns, but, after that, and especially after the returns have been reviewed and assessments made, there are strong administrative reasons for not permitting the upsetting of the whole basis of calculation. \* \* \* [Italics supplied.]" 20 T.C.M. at 640.

As I have already pointed out in connection with *Mundy,* the passage of subsection 6013(b) has removed the central premise of this argument. Congress has said, in effect, that the "strong administrative reasons for not permitting the upsetting of the whole basis of calculation" must give way to a taxpayer's freedom of choice, so long as the taxpayer makes his final election of joint rates within three years of the last legal date for filing his return. That the Commissioner, rather than the taxpayer, has made an initial election of individual tax rates should not, without more, prevent the taxpayer from choosing to be taxed at joint rates; from the Commissioner's point of view, his election is indistinguishable from one which the taxpayer might originally have made for himself. Should the election of the Commissioner stand three years unchallenged, a different case would be presented. Within that three years, however, Congress has suggested that the equities lie with the taxpayer. It seems, furthermore, highly inequitable to accept an argument by the Commissioner directed to his administrative burden of recomputation when, had he

simply determined the amount of income upon which tax was due and let the taxpayer make an election of filing status, the burden could have been avoided. In truth, the Commissioner is making an unwanted and expensive election for a taxpayer and thereafter employing that election to assert that its modification would be burdensome to his agency.[9]

The Durovics filed joint income tax returns for the years at issue less than three months after having received a deficiency notice. I doubt that even the *Grobart* court—which had faced a two year acceptance by a taxpayer of a Commissioner's election of individual tax rates—would have disallowed those returns. In any event, *Grobart,* and hence *Spanos,* are based on old law, the amendment of which has left them little vitality. I would require the Commissioner to compute the tax owed by the Durovics on the basis of joint rates.

9. For this reason, I am not convinced that subsection 6013(b)(2)(C)—which precludes the changeover allowed by subsection 6013(b)(1) when a spouse has been mailed a deficiency notice and has filed a petition in the Tax Court—should be viewed as a Congressional intimation of the equities which pertain to

cases where the taxpayer has not initially made an election to be taxed at individual rates.